UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE FUNICULAR FUND, LP, ANSON INVESTMENTS MASTER FUND LP, AND ANSON EAST MASTER FUND LP, <br><br> Plaintiffs, <br><br> v. <br><br> GREENIDGE GENERATION HOLDINGS INC. AND JEFFREY KIRT, <br><br> Defendants. | Case No.  22-cv-10832 |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND COMMON LAW FRAUD

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................................ 1

II.  JURISDICTION AND VENUE ......................................................................................... 3

III. PARTIES ............................................................................................................................ 3

      A.   Plaintiffs ................................................................................................................. 3

      B.   Defendants .............................................................................................................. 4

      C.   Relevant Non-Parties ............................................................................................. 5

IV.  SUBSTANTIVE ALLEGATIONS .................................................................................... 6

      A.   Announcement of the Merger ................................................................................. 6

      B.   The Structure of the Merger.................................................................................... 8

      C.   The Merger Agreement Informs the Public that Greenidge Will Pay the
          Fractional Share Consideration to Holders of Support Capital Stock ................. 10

      D.   The Proxy Informs Investors that Greenidge Will Pay Fractional Share
          Consideration to Holders of Support Common Stock .......................................... 13

      E.   The Structure of Ownership of Securities in the United States ............................ 16

      F.   As Used in the Merger Agreement and Proxy, the Holders of Support
          Capital Stock Entitled to Receive Fractional Shares of Greenidge Class A
          Common Stock in the Merger Were the Beneficial Owners of Support
          Capital Stock.......................................................................................................... 18

      G.   The Closing of the Merger and the Announcement of the Exchange Ratio ......... 23

      H.   The Calculation Payment of the Fractional Share Consideration As Set
          Forth in the Merger Agreement and Proxy .......................................................... 30

      I.   Defendants' Payment of the Fractional Share Consideration ............................... 35

      J.   The Merger's Impact on Support Exchange Traded Options ............................... 41

      K.   Defendants' Materially False and Misleading Statements or Omissions of
          Material Fact .......................................................................................................... 43

      L.   Additional Scienter Allegations............................................................................ 59

      M.   Plaintiffs' Purchases of Support Securities, Damages, and Reliance .................. 63

1.      Funicular's Purchases of Support Common Stock, Support Common Stock Call Options, and GREE1 Call Options; Sale of Support Common Stock Put Options and GREE1 Put Options; and Damages .................................................................................... 64

2.      Anson's Purchases of GREE1 Call Options and Damages ..................... 67

N.      Loss Causation ........................................................................................... 69

V.   CAUSES OF ACTION ........................................................................................... 70

Count I Violation of Section 10(b) of the Exchange Act and Sec Rule 10b-5 Against All Defendants ....................................................................................... 70

Count II Violation of Section 20(a) of the Exchange Act Against Defendant Kirt .......... 72

Count III In the Alternative, Common Law Fraud Against All Defendants .................... 74

PRAYER FOR RELIEF ................................................................................................ 74

DEMAND FOR JURY TRIAL ...................................................................................... 75

Appendix 1 ................................................................................................................... 76

Plaintiffs, The Funicular Fund, LP ("Funicular"), Anson Investments Master Fund LP ("AIMF"), and Anson East Master Fund LP ("AEMF," collectively with AIMF, "Anson," and AIMF and AEMF with Funicular, "Plaintiffs"), by their undersigned attorneys, hereby bring this Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j and 78t) (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder against Greenidge Generation Holdings Inc. ("Greenidge") and Jeffrey Kirt (the former Chief Executive Officer ("CEO") of Greenidge) (collectively, "Defendants"). In the alternative, Plaintiffs also bring a claim for common law fraud against Defendants.

Plaintiffs' allegations are based on their personal knowledge as to their own acts, and on information and belief or documentary proof as to all other matters, such information and belief having been informed by the investigation conducted by their counsel, which includes analyses of, among other things (a) regulatory filings made by Greenidge with the SEC; (b) press releases issued by Defendants; (c) information received from Plaintiffs' custodial banks, the Depository Trust Company ("DTC"), and/or the Options Clearing Corporation ("OCC"); (d) publicly available news reports and stock price and volume information; and (e) other information readily obtainable on the Internet.

## I.    NATURE OF THE ACTION

1.     This action concerns fraudulent statements made and/or a fraudulent scheme committed by Defendants Greenidge and Kirt related to Greenidge's payment of cash in lieu of fractional shares of Greenidge Class A Common Stock in connection with Greenidge's acquisition of Support.com, Inc. ("Support") in a stock-for-stock transaction (the "Merger"), which was announced on March 22, 2021 and completed on September 14, 2021.

2.     As alleged herein, as a result of Defendants' fraud, Greenidge kept for itself millions of dollars in cash that Defendants publicly stated would be paid to the beneficial owners of Support Capital Stock (comprised of Support Common Stock and Support Preferred Stock) who were entitled to receive cash in lieu of fractional shares of Greenidge Class A Common Stock upon the closing of the Merger.

3.     As a result of Defendants' fraud, beneficial owners of Support Capital Stock received cash in lieu of fractional shares of Greenidge Class A Common Stock at the rate of $28.64 per whole share of Greenidge Class A Common Stock, approximately 10% of the $281.80 per whole share that Defendants stated publicly they would pay.

4.     Defendants' fraud also caused damages to investors in call and put option contracts for Support Common Stock and Greenidge Class A Common Stock with exercise dates of September 17, 2021, which, upon exercise or assignment, entitled an investor to 11 shares of Greenidge Class A Common Stock and cash in lieu of 0.5 fractional shares of Greenidge Class A Common Stock per option contract.

5.     As a result of Defendants' fraud, investors in call and put option contracts for Support Common Stock and Greenidge Class A Common Stock with exercise dates of September 17, 2021 received only $14.32 for the 0.5 fractional share of Greenidge Class A Common Stock component of each option contract, instead of the $140.90 they were entitled to, causing damages of $126.58 per option contract.

6.     Plaintiffs Funicular and Anson were investors in call and put option contracts for Support Common Stock and Greenidge Class A Common Stock with exercise dates of September 17, 2021, and Funicular was an investor in Support Common Stock.

7.     Funicular and Anson suffered damages of more than $4.1 million attributable to Defendants' fraud.

## II.     <u>JURISDICTION AND VENUE</u>

8.     This Court has jurisdiction over the claims for violation of the Exchange Act pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and federal question jurisdiction (28 U.S.C. § 1331).

9.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1331 because the state law claims form part of the same case or controversy as Plaintiffs' claims for violation of the Exchange Act.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as acts or transactions constituting violations of the Exchange Act took place in this District; Defendants transact business in this District; and Support Common Stock was, and Greenidge Class A Common Stock is, traded on the NasdaqGS exchange, which is located in this District.

11.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III.     <u>PARTIES</u>

### A.     <u>Plaintiffs</u>

12.     Plaintiff Funicular is a Delaware limited partnership with its principal place of business located in San Francisco, CA.   As described herein, Funicular purchased Support Common Stock, exchange traded Support Common Stock call options with expiration dates of September 17, 2021, and exchange traded Greenidge Class A Common Stock call options with

expiration dates of September 17, 2021, and sold exchange traded Support Common Stock put options with expiration dates of September 17, 2021 and Greenidge Class A Common Stock put options with expiration dates of September 17, 2021, in reliance upon Defendants' materially false and misleading statements or omissions of material fact, and was damaged when the truth concerning these materially false and misleading statements and/or Defendants' fraudulent scheme was revealed.

13.     Plaintiff AIMF is a Cayman Islands limited partnership with its principal place of business located in Toronto, Ontario, Canada.  As described herein, AIMF purchased exchange traded Greenidge Class A Common Stock call options with expiration dates of September 17, 2021 in reliance upon Defendants' materially false and misleading statements or omissions of material fact, and was damaged when the truth concerning these materially false and misleading statements and/or Defendants' fraudulent scheme was revealed.

14.     Plaintiff AEMF is a Cayman Islands limited partnership with its principal place of business located in Toronto, Ontario, Canada.  As described herein, AEMF purchased exchange traded Greenidge Class A Common Stock call options with expiration dates of September 17, 2021 in reliance upon Defendants' materially false and misleading statements or omissions of material fact, and was damaged when the truth concerning these materially false and misleading statements and/or Defendants' fraudulent scheme was revealed.

### B.      **Defendants**

15.     Defendant Greenidge is incorporated in the State of Delaware and has its principal place of business in Fairfield, CT.  At the time of the Merger, Greenidge's principal place of business was located in Dresden, NY.

16.     Prior to the completion of the Merger, Greenidge was a privately held corporation, and was majority owned by private investment funds managed by Atlas FMR LLC d/b/a Atlas

Holdings LLC ("Atlas"), a private equity firm.  Prior to and after the completion of the Merger, Atlas was, through those investment funds, the controlling stockholder of Greenidge.

17.     On September 15, 2021, as a result of the completion of the Merger, Greenidge became a publicly traded company.  Greenidge Class A Common Stock is traded on the NasdaqGS exchange under the symbol "GREE."

18.     According to the Proxy Statement for a Special Meeting of Stockholders of Support.com and Prospectus for 2,998,261 shares of Class A Common Stock of Greenidge Generation ("Proxy"), filed by Greenidge and Support with the SEC in connection with the Merger on August 10, 2021,[1]  "Greenidge owns and operates a vertically integrated bitcoin mining and power generation facility in the Town of Torrey, New York…. Greenidge is currently mining bitcoin and contributing to the security and transactability of the bitcoin ecosystem, while concurrently meeting the power needs of homes and businesses in its region."

19.     Defendant Kirt served as Greenidge's CEO and a member of Greenidge's Board of Directors ("Greenidge Board') from March 2021 through October 2022.  As alleged herein, Kirt signed and/or made materially false and misleading statements disseminated or issued by Greenidge.

**C.     Relevant Non-Parties**

20.     Support is incorporated under the laws of the State of Delaware and has its principal place of business in Wilmington, DE.  Prior to September 14, 2021, when the Merger was completed, Support was a publicly traded company and Support Common Stock traded on the NasdaqGS under the symbol "SPRT."  As a result of the Merger, Support is now a wholly owned subsidiary of Greenidge.

---

[1] www.sec.gov/Archives/edgar/data/0001844971/000119312521241844/d166032d424b3.htm.

21.     According to the Proxy, "Support provides customer and technical support solutions delivered by home-based employees.  Support's homesourcing model, which enables outsourced work to be delivered by people working from home, has been specifically designed for remote work, with attention to security, recruiting, training, delivery, and employee engagement." Proxy at 13.

22.     Lance Rosenzweig is President and CEO of Support and a senior member of management of Greenidge.  Prior to the Merger, Rosenzweig was the CEO of Support and a member of Support's Board of Directors ("Support Board") starting on August 10, 2020.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Announcement of the Merger

23.     On March 19, 2021, Support, Greenidge, and GGH Merger Sub, Inc. (a wholly owned subsidiary of Greenidge) entered into an Agreement and Plan of Merger (the "Merger Agreement") for the Merger.[2]  The Merger Agreement was signed by Kirt on behalf of Greenidge and Rosenzweig on behalf of Support.

24.     The Merger was first announced to the public on March 22, 2021, at approximately 6:20 a.m. Eastern Time Zone ("ET"), when Support filed a Form 8-K with the SEC ("March 22, 2021 Form 8-K").[3]  The March 22, 2021 Form 8-K was signed by Rosenzweig on behalf of Support.  The Merger Agreement was attached as Exhibit 2.1 to the March 22, 2021 Form 8-K.

25.     A copy of the Merger Agreement was also filed by Greenidge with the SEC on March 22, 2021 at 6:23 a.m. ET pursuant to Rule 425 of the Securities Act of 1933.[4]

---

[2] www.sec.gov/Archives/edgar/data/1104855/000119312521088364/d122974dex21.htm.

[3] www.sec.gov/Archives/edgar/data/1104855/000119312521088364/d122974d8k.htm.

[4] www.sec.gov/Archives/edgar/data/1104855/000119312521088368/d131111d425.htm.

26.     The March 22, 2021 Form 8-K also attached as Exhibit 99.1 and incorporated by reference a copy of a joint press release from Greenidge and Support announcing the Merger ("March 22, 2021 Press Release").[5]  The March 22, 2021 Press Release was published on wire services at approximately 6:31 a.m. ET on March 22, 2021.[6]

27.     A copy of the joint press release was also filed by Greenidge[7] with the SEC on March 22, 2021 at 6:30 a.m. ET pursuant to Rule 425 of the Securities Act of 1933.[8]

28.     On Friday March 19, 2021, the last trading day before the Merger was first announced, Support Common Stock closed at a price of $2.14 per share and had a trading volume of 63,780 shares.

29.     On March 22, 2021, the price of Support Common Stock closed at $7.10 per share, on volume of 282,618,361 shares.

30.     According to Support's Form 10-K for the fiscal year ended December 31, 2020, which was filed with the SEC on March 30, 2021,[9] as of March 5, 2021, Support had 19,656,591 shares of Support Common Stock issued and outstanding.

---

[5] www.sec.gov/Archives/edgar/data/1104855/000119312521088364/d122974dex991.htm.

[6] www.businesswire.com/news/home/20210322005353/en/Bitcoin-Miner-Greenidge-Generation-Holdings-Inc.-and-Support.com-Inc.-Nasdaq-SPRT-Announce-Merger-Agreement.

[7] www.sec.gov/Archives/edgar/data/1104855/000119312521088381/d131111d425.htm.

[8] On March 23, 2021, at 5:03 p.m. ET, Support filed an Amended Form 8-K (8-K/A) with the SEC "solely to correct one typographical error" found in the March 22, 2021 joint press release (the "March 23, 2021 Form 8-K/A").   www.sec.gov/Archives/edgar/data/1104855/000119312521091304/d131914d8ka.htm. The March 23, 2021 Form 8-K/A was filed to correct a reference to "March 19, 2020" in the March 22, 2021 Press Release with "March 19, 2021," and attached an amended joint press release as Exhibit 99.1. The March 23, 2021 Form 8-K/A was signed by Rosenzweig on behalf of Support.  Greenidge also filed an amended copy of the joint press release with the SEC on March 23, 2021 at 5:09 p.m. ET, pursuant to Rule        425        of        the        Securities        Act        of        1933. www.sec.gov/Archives/edgar/data/1104855/000119312521091327/d131914d425.htm.

[9] https://www.sec.gov/Archives/edgar/data/1104855/000165495421003471/sprt_10k.htm.

B.     **The Structure of the Merger**

31.     To effect the Merger, GGH Merger Sub, a wholly owned subsidiary of Greenidge, would merge with and into Support, with Support surviving as a wholly owned subsidiary of Greenidge.  Merger Agreement § 2.01.

32.     In connection with the Merger, Greenidge agreed to issue 2,998,261 shares of Greenidge Class A Common Stock.  March 22, 2021 Form 8-K; Merger Agreement § 1.01.

33.     Those 2,998,261 shares of Greenidge Class A Common Stock represented the "Merger Consideration,"[10] which would be exchanged for all outstanding shares of Support Capital Stock.

34.     The 2,998,261 shares of Greenidge Class A Common Stock would amount to approximately 8% of the total amount of outstanding Greenidge Capital Stock (which was comprised of Greenidge Class A Common Stock, Greenidge Class B Common Stock, and Greenidge Preferred Stock).  March 22, 2021 Form 8-K.

35.     After the Merger, Atlas would beneficially own a majority of the voting power of all outstanding shares of Greenidge Common Stock (comprised of Greenidge Class A Common Stock and Greenidge Class B Common Stock) and remain the owner of 77% of Greenidge Class B Common Stock, with super voting rights of 10 times the voting rights of Greenidge Class A Common Stock.  Greenidge Class B Common Stock would otherwise be economically equivalent to Greenidge Class A Common Stock.  March 22, 2021 Form 8-K; Proxy at 147, 159.

---

[10] The Merger Agreement defined the "Merger Consideration" to be "a total number of shares of [Greenidge] Class A Common Stock equal to the sum of (i) the [Support] Business Consideration [1,873,913 shares of Greenidge Class A Common Stock] plus (ii) the [Support] Closing Cash Consideration [1,124,348 shares of Greenidge Class A Common Stock]."  Merger Agreement § 1.01.

36.     The Merger Agreement provided that, through the Merger, each share of Support Capital Stock would be cancelled and converted into the right to receive the "Per Share Merger Consideration" (a number of shares of Greenidge Class A Common Stock equal to the Exchange Ratio), and that each holder of Certificates or Book-Entry Shares of Support Capital Stock would have the right to receive the Per Share Merger Consideration:

> At the Effective Time, by virtue of the Merger and without any action on the part of Pubco [Support], Merger Sub, the Company [Greenidge] or their respective stockholders, each share of Pubco [Support] Capital Stock issued and outstanding immediately prior to the Effective Time (each such share of Pubco [Support] Capital Stock a "Share" and collectively, the "Shares") shall be canceled and converted into the right to receive the Per Share Merger Consideration, and ***each holder of certificates ("Certificates") or book-entry shares ("Book-Entry Shares") which immediately prior to the Effective Time represented such Shares shall thereafter cease to have any rights with respect thereto except the right to receive the Per Share Merger Consideration***, in each case to be issued or paid, without interest, in consideration therefor.

Merger Agreement § 3.01(a) (emphasis added).[11]

37.     The "Exchange Ratio" was the fractional ratio of the Merger Consideration to the total number of shares of Support Capital Stock and shares of Support Common Stock underlying Support equity awards as of the Exercise Calculation Date (the second Business Day immediately preceding the closing of the Merger).[12]

---

[11] The Merger Agreement defined "Effective Time" to "the date and time of [the] filing of the Certificate of Merger (or such later time as may be agreed by each of the parties hereto and specified in the Certificate of Merger)" with the Secretary of State of the State of Delaware.  Merger Agreement § 2.03.

[12] The Merger Agreement defined "Exchange Ratio" to mean "a fraction, expressed as a decimal rounded to the nearest one-thousandth, equal to the quotient of (i) the Merger Consideration divided by (ii) Fully Diluted Pubco Share Number [(a) the total number of shares of Pubco Capital Stock outstanding as of immediately prior to the Effective Time plus (b) the total number of Pubco Option FDS Shares with respect to all Pubco Options outstanding as of the Exercise Calculation Date plus (c) the total number of Pubco Award Shares with respect to all Pubco Awards outstanding as of the Exercise Calculation Date]," "Exercise Calculation Date" to be "the close of business on the second Business Day immediately preceding the Closing [of the Merger]," and "Business Day" to be "any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of New York."  Merger Agreement § 1.01.

38.     Because the Exchange Ratio was dependent upon the number of outstanding shares of Support Capital Stock and Support equity awards as of the second business day immediately preceding the closing of the Merger, it was not possible to calculate the Exchange Ratio until that time.

39.     The Merger Agreement provided that Support and Greenidge would calculate and announce the Exchange Ratio on the business day immediately preceding the closing of the Merger.  Merger Agreement § 3.01(a).

**C.     The Merger Agreement Informs the Public that Greenidge Will Pay the Fractional Share Consideration to Holders of Support Capital Stock**

40.     Because the Exchange Ratio was, by its own definition, a fraction, it was anticipated that applying the Exchange Ratio would result in fractions of Greenidge Class A Common Stock.

41.     The Merger Agreement provided that fractional shares of Greenidge Class A Common Stock would not be issued in the Merger.

42.     Instead, any "Support Stockholder," defined by the Merger Agreement to be "holders of [Support] Capital Stock" (Merger Agreement § 1.01), who was entitled to receive a fraction of Greenidge Class A Common Stock would receive "Fractional Share Consideration," equal to the number of fractional shares multiplied by the quotient of the "Support Closing Price" (the volume weighted average trading price of Support Common Stock during the ten trading days ending two business days before the closing of the Merger) divided by the Exchange Ratio:

> No fractional shares of [Greenidge] Class A Common Stock shall be issued in connection with the Merger, and no certificates or scrip for any such fractional shares shall be issued. ***Any [Support] Stockholder who would otherwise be entitled to receive a fraction of a share of [Greenidge] Class A Common Stock (after aggregating all fractional shares of [Greenidge] Class A Common Stock issuable to such holder) shall, in lieu of such fraction of a share, be paid in cash the dollar amount (rounded to the nearest whole cent), without interest, determined by multiplying such fraction by the quotient of (x) the [Support]***

***Closing Price*** ["the volume weighted average trading price per share of [Support] Common Stock for the ten trading day period ending on and including the Exercise Calculation Date ["the close of business on the second Business Day immediately preceding the Closing"]]" ***divided by (y) the Exchange Ratio (such product, the "Fractional Share Consideration").*** On the Business Day immediately preceding the Closing Date the parties shall calculate and publicly announce the Exchange Ratio.

Merger Agreement § 3.01(a) (emphasis added), § 1.01.

43. The Merger Agreement also set forth procedure for paying the Fractional Share Consideration to Support Stockholders who were entitled to receive a fractional share of Greenidge Class A Common Stock pursuant to the Merger. Merger Agreement § 3.03.

44. First, Greenidge was required to deposit with the Exchange Agent (Computershare Investor Services, LLC) evidence of Greenidge Class A Common Stock issuable in book-entry form to pay the Merger Consideration, plus cash to pay the aggregate Fractional Share Consideration. These deposits were for the sole benefit of Support Stockholders, and if they were not enough to pay the Fractional Share Consideration, then Greenidge was required to deposit additional funds to cover the shortfall:

> Prior to the Effective Time, the Company shall designate Computershare Investor Services, LLC (the "**Exchange Agent**") to act as the exchange agent in connection with the Merger. Immediately prior to the Effective Time, ***[Greenidge] shall deposit, or cause to be deposited***, with the Exchange Agent (***i) evidence of the [Greenidge] Class A Common Stock issuable pursuant to <u>Section 3.01</u> and <u>Section 3.04</u> in book-entry form equal to the Merger Consideration (excluding any Fractional Share Consideration), and (ii) cash in immediately available funds in an amount sufficient to pay the aggregate Fractional Share Consideration*** (such evidence of book-entry shares of [Greenidge] Class A Common Stock and cash amounts, together with any dividends or other distributions with respect thereto, the "**Exchange Fund**"), in each case, for the sole benefit of the holders of shares of [Support] Capital Stock. ***In the event the Exchange Fund shall be insufficient to pay the aggregate Fractional Share Consideration, [Greenidge] shall promptly deposit, or cause to be promptly deposited, additional funds with the Exchange Agent in an amount which is equal to the deficiency*** in the amount required to make such payment. [Greenidge] shall cause the Exchange Agent to make, and the Exchange Agent shall make, delivery of the Merger Consideration, including payment of the Fractional Share Consideration out of the Exchange Fund in accordance with this Agreement.

> The Exchange Fund shall not be used for any purpose that is not expressly provided for in this Agreement.  The Exchange Agent shall obtain no rights or interests in any Certificates or Book-Entry Shares.

Merger Agreement § 3.03(a) (emphasis added).

45.     Second, Greenidge was required to mail to each holder of record of Support Capital Stock a letter and instructions for effecting the surrender of Certificates and Book-Entry Shares in exchange for Merger Consideration and Fractional Share Consideration:

> Promptly after the Effective Time, [Greenidge] shall, and shall cause the Surviving Corporation to, cause the Exchange Agent to mail to each holder of record of shares of [Support] Capital Stock whose shares of [Support] Capital Stock were converted into the right to receive the Merger Consideration (i) a letter of transmittal in customary form and reasonably acceptable to each of [Greenidge] and [Support], which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates (or affidavits of loss in lieu thereof) or transfer of the Book-Entry Shares to the Exchange Agent and (ii) instructions for effecting the surrender of the Certificates or transfer of the Book-Entry Shares in exchange for payment of the Merger Consideration issuable and payable in respect of such shares of [Support] Capital Stock pursuant <u>Section 3.01</u>, including any amount payable in respect of Fractional Share Consideration.

Merger Agreement § 3.03(b).

46.     Third, upon receipt by the Exchange Agent of a Certificate or an agent's message in the case of Book-Entry Shares, the holder of the Certificate or Book-Entry Share would receive the Merger Consideration and Fractional Share Consideration:

> Upon (A) surrender to the Exchange Agent of a Certificate, together with such letter of transmittal properly completed and validly executed in accordance with the instructions thereto, or (B) receipt by the Exchange Agent of an "agent's message" in the case of Book-Entry Shares and, in each case, such other documents as may be reasonably required pursuant to such instructions, the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor, and the Exchange Agent shall, and [Greenidge] shall cause the Exchange Agent to, issue and pay promptly to such holder, the applicable Merger Consideration pursuant to <u>Section 3.01</u>, including any Fractional Share Consideration that such holder has the right to receive pursuant to the provisions of <u>Section 3.01</u>.

Merger Agreement § 3.03(c).

47.     An "agent's message" is a message transmitted by DTC to the Exchange Agent which states that DTC has received an express acknowledgement from its participant tendering the Book-Entry securities (the securities owned by the beneficial owners).

48.     Finally, the Merger Agreement recognized that non-registered transfers of Support Capital Stock are still valid and the transferee (new beneficial owner) owns the right to receive the Merger Consideration and Fractional Share Consideration:

> ***In the event of a transfer of ownership of shares of [Support] Capital Stock that is not registered in the transfer or stock records of [Support]***, any cash to be paid ***upon, or shares of [Greenidge] Class A Common Stock to be issued upon, due surrender of the Certificate or Book-Entry Share formerly representing such shares of [Support] Capital Stock may be paid or issued, as the case may be, to such a transferee if such Certificate or Book-Entry Share is presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer*** and to evidence that any applicable stock transfer or other similar Taxes have been paid or are not applicable.  Until surrendered as contemplated by this Section 3.03, each Certificate and Book-Entry Share shall be deemed at any time after the Effective Time to represent only the right to receive the applicable Merger Consideration as contemplated by Section 3.01, including any amount payable in respect of Fractional Share Consideration.

Merger Agreement § 3.03(d) (emphasis added).

### D.     The Proxy Informs Investors that Greenidge Will Pay Fractional Share Consideration to Holders of Support Common Stock

49.     On May 4, 2021, at 8:09 a.m. ET, before the market for Support Common Stock opened for the day, Greenidge filed with the SEC a joint preliminary proxy statement for special meeting of stockholders of Support and prospectus for 2,998,261 shares of Class A Common Stock of Greenidge.[13]  The filing was made on Form S-4.  The Form S-4 was signed by, among others, Kirt.  The Form S-4 also attached a copy of the Merger Agreement or incorporated the Merger Agreement by reference.

---

[13] www.sec.gov/Archives/edgar/data/0001844971/000119312521149057/d166032ds4.htm.

50.     On May 4, 2021, the price of Support Common Stock closed at $3.43 per share, on trading volume of 430,753 shares.

51.     Greenidge filed amendments to the Form S-4 on June 25, 2021,[14] July 16, 2021,[15] and August 6, 2021.[16]  Each amendment was signed by, among others, Kirt, and attached a copy of the Merger Agreement or incorporated the Merger Agreement by reference.

52.     The Form S-4 was deemed effective on August 10, 2021 at 4:00 p.m. ET

53.     On August 10, 2021, at 4:22 p.m. ET, after the market for Support Common Stock closed for the day, the final Proxy was filed by Greenidge with the SEC on a Form 424B3.[17]  The Proxy was, by its own terms, part of the Registration Statement filed on Form S-4 filed with the SEC.  Proxy at 1.

54.     The Proxy was also filed by Support with the SEC on a Schedule 14A on August 10, 2021 at 4:24 p.m. ET.[18]

55.     The first page of the Proxy, a letter to Support Stockholders, was signed by Kirt on behalf of Greenidge and by Rosenzweig on behalf of Support.

56.     The Merger Agreement, which was signed by Kirt (on behalf of Greenidge) and Rosenzweig (on behalf of Support), was attached to the Proxy.

57.     The Proxy described the procedure to exchange Support Common Stock for Greenidge Class A Common Stock plus the Fractional Share Consideration:

> Under the Merger Agreement, prior to the Effective Time, Greenidge will designate Computershare Investor Services, LLC ("Computershare") to act as the exchange agent in connection with the Merger.  Immediately prior to the Effective Time,

---

[14] www.sec.gov/Archives/edgar/data/0001844971/000119312521200431/d166032ds4a.htm.

[15] www.sec.gov/Archives/edgar/data/0001844971/000119312521217543/d166032ds4a.htm.

[16] www.sec.gov/Archives/edgar/data/0001844971/000119312521239357/d166032ds4a.htm.

[17] www.sec.gov/Archives/edgar/data/0001844971/000119312521241844/d166032d424b3.htm.

[18] www.sec.gov/Archives/edgar/data/1104855/000119312521241850/d166032ddefm14a.htm.

Greenidge will deposit or cause to be deposited with Computershare evidence of class A common stock issuable pursuant to the Merger Agreement and cash sufficient to pay the fractional share consideration (as described below) (the "Exchange Fund"), for the sole benefit of the holders of shares of Support capital stock, in accordance with the Merger Agreement.

Promptly after the Effective Time, Greenidge will cause Computershare to send each holder of Support common shares whose shares were converted to the right to receive shares of class A common stock, a letter of transmittal and instructions advising such Support stockholders how to surrender stock certificates and book-entry shares in exchange for their portion of the class A common stock constituting the Merger Consideration.  Upon surrender (i) to Computershare of a certificate together with a properly completed and validly executed letter of transmittal, or (ii) receipt by Computershare of an "agent's message" in the case of book-entry shares, and, in each case, such other documents as may be reasonably required pursuant to such instructions, the holder of such certificate or book-entry shares of Support common stock will be entitled to receive their portion of the class A common stock constituting the Merger Consideration (including any fractional share consideration) in exchange therefor (without deduction or withholding for any tax).

Proxy at 98-99.

58.     The Proxy also stated that no fractional shares of Greenidge Class A Common Stock would be issued as part of the Merger, and instead each holder of Support Common Stock who would have received fractional shares of Greenidge Class A Common Stock would be paid the Fractional Share Consideration:

No fractional shares of class A common stock will be issued to any holder of Support common stock.  Instead, ***Greenidge will pay to each holder of Support common stock who would have otherwise received a fractional share of class A common stock, an amount of cash (rounded to the nearest whole cent), without interest, equal to the number of such fractional shares for which such holder of Support common stock would be entitled to receive multiplied by the quotient of (x) the VWAP divided by (y) the Exchange Ratio***.

Proxy at 99 (emphasis added).

59.     On August 10, 2021, Support Common Stock closed at $7.45 per share on volume of 2,932,958 shares.

60.     On August 11, 2021, the next trading day after Proxy was filed with the SEC, the price of Support Common Stock closed at $7.17 per share, on trading volume of 3,069,185 shares.

61.     According to the Proxy, there were 24,231,626 shares of Support Common Stock issued and outstanding as of July 26, 2021.  Proxy at 6.

E.     **The Structure of Ownership of Securities in the United States**

62.     The vast majority of publicly traded shares in the United States are not registered on a company's books in the names of the beneficial owners/holders – those investors who paid for, and have the right to vote and sell, the shares.  Rather, they are registered in "street name" in the name of "Cede & Co.," an entity which holds securities on behalf of DTC.

63.     Shares of stock held in street name by DTC are typically represented by one or more immobilized jumbo stock certificates held by DTC.

64.     DTC holds shares on behalf of its participants, who are banks, brokers, custodians, and other intermediaries.

65.     DTC holds shares on behalf of its participants in fungible bulk, meaning that none of the shares are issued in the names of DTC's participants.

66.     DTC uses an electronic book-entry system to track the number of shares of stock that each participant holds.

67.     In turn, each participant uses their own book-entry system to track the number of shares of stock that each of its customers (beneficial owners and other intermediaries) hold.

68.     The beneficial owners, therefore, are the ultimate holders of book-entry shares.

69.     Under federal statute and regulations, DTC is defined to be a clearing agency:

The term "clearing agency" means any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities.  Such term also means any person, such as a securities depository, who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned,

> or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates.

15 U.S.C. § 78c(a)(23)(A).

70.    Under federal statute and regulation, the brokers and banks (*i.e.,* DTC's participants) that hold the securities for their customers are the "record holders:"

> For purposes of § 240.14c-7, the term "record holder" means any broker, dealer, voting trustee, bank, association or other entity that exercises fiduciary powers which holds securities of record in nominee name or otherwise or as a participant in a clearing agency registered pursuant to section 17A of the Act.

17 C.F.R. § 240.14c-1(i).  An "entity that exercised fiduciary powers" is defined by the regulations to be "any entity that holds securities in nominee name or otherwise on behalf of a beneficial owner but does not include a clearing agency registered pursuant to section 17A of the Act, or a broker or a dealer."  17 C.F.R. § 240.14c-1(c).

71.    Under federal statue and regulation, the beneficial owner is the person who has the right to vote or dispose of the security:

> For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>
> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
>
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a).

72.    As such, the investor is the beneficial owner and the ultimate holder of Book-Entry shares.

F.   **As Used in the Merger Agreement and Proxy, the Holders of Support Capital Stock Entitled to Receive Fractional Shares of Greenidge Class A Common Stock in the Merger Were the Beneficial Owners of Support Capital Stock**

73.   The Merger Agreement and Proxy communicated to investors and the public, and reasonable investors and the public would conclude, that the beneficial owners of Support Capital Stock or Support Common Stock were (a) the "holder[s] of…Book-Entry Shares" who had the right "to receive the Per Share Merger Consideration" (Merger Agreement § 3.01(a)); (b) the "[holders of Support Capital Stock] who would otherwise be entitled to receive a fraction of a share of Company [Greenidge] Class A Common Stock" (Merger Agreement § 3.01(a)); (c) the "holder[s] of…book-entry shares of Support common stock [] entitled to receive their portion of the [Greenidge] class A common stock constituting the Merger Consideration (including any fractional share consideration)" (Proxy at 98-99); and (d) the "holder[s] of Support common stock [who] would have otherwise received a fractional share of Greenidge Class A Common stock" (Proxy at 99); and as such, Greenidge would pay and/or cause the Exchange Agent to pay the beneficial owners of Support Capital Stock the Fractional Share Consideration for their fractional shares of Greenidge Class A Common Stock at the price set forth in the Merger Agreement.

74.   The Merger Agreement states that the Support Board "unanimously…determined to recommend, upon the terms and subject to the conditions set forth in [the Merger Agreement], that the [Support] Stockholders vote to approve [the Merger Agreement] and the Merger." Merger Agreement, Recitals.  As the beneficial owners of Support Capital Stock are the persons who have the power to vote in favor of (or against) the Merger and the Merger Agreement, the term "Pubco [Support] Stockholder" (holders of Support Capital Stock) as used in the Merger Agreement means beneficial owner of Support Capital Stock.

75.   The beneficial owners of Support Capital Stock are the persons who have investment power over the Support Capital Stock, including the power to sell the stock and receive

the proceeds of such sale.  The Merger is a sale of Support and Support Capital Stock for Greenidge Class A Common Stock.  Therefore, the beneficial owners of Support Capital Stock are the "Pubco [Support] Stockholder[s] [holders of Support Capital Stock] who [were] entitled to receive a fraction of a share of Greenidge Class A Common Stock…" and the Fractional Share Consideration in lieu of those fractional shares.

76.     Also, because the beneficial owners of Support Capital Stock are the persons who have investment power over the Support Capital Stock, they were also the persons entitled to receive the Per Share Merger Consideration, which was calculated using a fractional Exchange Ratio.  The process of paying the Per Share Merger Consideration through a fractional Exchange Ratio is what created fractional shares of Greenidge Class A Common Stock, and created the necessity to pay the Fractional Share Consideration.  Therefore, the beneficial owners, as the holders of Support Capital Stock who were entitled to receive the Per Share Merger Consideration, are also the holders of Support Capital Stock entitled to receive the Fractional Share Consideration.

77.     The beneficial owners of Support Capital Stock are the holders of Book-Entry Shares entitled to receive the Per Share Merger Consideration (and hence the fractional shares of Greenidge Class A Common Stock).

78.     In the Proxy, Defendants explained the process for beneficial holders to vote their shares of Support Capital Stock at the special meeting of stockholders to consider the Merger Agreement or attend the special meeting of stockholders:

a.     "If your shares are held in the name of a bank, broker or other nominee holder of record, please follow the instructions on the voting instruction form furnished to you by such record holder."  Proxy at Opening Letter.

b.       "All holders of Support's common stock as of the record date for the special meeting (5 p.m. Eastern Time on July 26, 2021) are entitled to receive notice of, and to vote at, the special meeting.  As of the close of business on the record date, there were 24,231,626 shares of Support common stock issued and outstanding.  Each holder of Support common stock as of the record date is entitled to one vote per share."  Proxy at 6.

c.       "Shares held in "street name" with respect to which the beneficial owner fails to give voting instructions to the broker, bank or other nominee holder of record will not be deemed present at the special meeting for the purpose of determining the presence of a quorum."  Proxy at 6.

d.       "If your shares are held by your bank, brokerage firm or other nominee, you are considered the beneficial owner of shares held in "street name" and you will receive a form from your bank, brokerage firm or other nominee seeking instruction from you as to how your shares should be voted.  If you beneficially own your shares and receive a voting instruction form, you can vote by following the instructions on your voting instruction form.  Please refer to information from your bank, brokerage firm or other nominee on how to submit voting instructions."  Proxy at 7; *see also* Proxy at 61.

e.       "Your bank, brokerage firm or other nominee will not automatically vote your shares for you.  Such entities typically have the authority to vote in their discretion on "routine" proposals when they have not received instructions on how to vote from the beneficial owner.  However, banks, brokers and other nominee holders of record typically are not allowed to exercise their voting discretion on matters that are "non-routine" without specific instructions on how to vote from the beneficial owner.  Each of the proposals to be considered at the special meeting as described in this proxy statement/prospectus are

considered non-routine.  Therefore banks, brokers, and other nominee holders of record do not have discretionary authority to vote on any of these proposals."  Proxy at 7; *see also* Proxy at 62.

      f.      "Broker non-votes are shares held by a bank, broker or other nominee holder of record that are present in person or represented by proxy at the special meeting, but with respect to which the bank, broker or other nominee holder of record is not instructed by the beneficial owner of such shares on how to vote on a particular proposal and does not have discretionary voting power on such proposal.  Because, as mentioned above, banks, brokers and other nominee holders of record do not have discretionary voting authority with respect to any of the proposals to be considered at the special meeting as described in this proxy statement/prospectus, if a beneficial owner of shares held in "street name" does not give voting instructions to the broker, bank or other nominee holder of record, then those shares will not be present in person or represented by proxy at the special meeting and will not count for purposes of determining if a quorum is present at the special meeting.  As a result, there will not be any broker non-votes in connection with the proposals to be considered at the special meeting as described in this proxy statement/prospectus."  Proxy at 7; *see also* Proxy at 62.

      g.      "You are not able to vote at the special meeting unless you have a proxy, executed in your favor, from the stockholder of record (bank, brokerage firm or other nominee) giving you the right to vote the shares.  To vote in person at the special meeting, you will need to contact your bank, brokerage firm or other nominee holder of record to obtain a written legal proxy to bring to the meeting."  Proxy at 7; *see also* Proxy at 62.

h.      "[I]f you are a Support stockholder of record (owning shares of Support common stock in your own name), prior to your being admitted to the special meeting, your name will be verified against a list of registered Support stockholders on the record date.  If you are not a Support stockholder of record but *hold* shares in "street name," i.e., through a bank, broker or nominee, you must bring proof of your beneficial ownership to the special meeting.  For example, you could bring an account statement showing that you beneficially owned shares of Support common stock as of the record date as acceptable proof of ownership.   Both record and ***beneficial stockholders*** should bring photo identification and an appropriate face covering for entrance to the special meeting.  Social distancing measures will be employed and attendees will need to wear face coverings throughout the duration of the special meeting."   Proxy at 12; *see also* Proxy at 62 (emphasis added).

79.     Because beneficial owners are those who have the power to vote the Support Common Stock in favor of, or against, the Merger, investors and the public would conclude that holders of Support Capital Stock entitled to vote concerning the Merger were those that were entitled to receive shares of Greenidge Class A Common Stock in an amount equal to the Exchange Ratio and the Fractional Share Consideration in lieu of fractional shares of Greenidge Class A Common Stock.

80.     Further, by instructing that only the beneficial owners of Support Common Stock can vote their shares concerning the Merger, the Proxy reinforced that the "Pubco [Support] Stockholders," who the Support Board recommended vote in favor of the Merger, were the beneficial owners of Support Common Stock.

81. The Proxy stated that "[t]he record date for the special meeting (5 p.m. Eastern Time on July 26, 2021) is earlier than the date of the special meeting. If you sell or otherwise transfer your shares after the record date but before the date of the special meeting, you will retain your right to vote at the special meeting. However, you will not have the right to receive any portion of the Merger Consideration in respect of such shares. In order to receive your portion of the Merger Consideration, you must hold your shares through completion of the Merger." Proxy at 9. This is a recognition that it was the beneficial owner, who had the power to sell and vote Support Common Stock, that was the person entitled to the Merger Consideration and the Fractional Share Consideration.

82. Beneficial owners of Support Capital Stock would likely not have voted for the Merger if they had been told or known that they would not receive the Fractional Share Consideration at the amount set forth in the Merger Agreement and Proxy.

**G.  The Closing of the Merger and the Announcement of the Exchange Ratio**

83. On Friday September 10, 2021, at approximately 11:30 a.m. ET, Support issued a press release ("September 10, 2021 Press Release") to announce that Support stockholders, at a special meeting conducted on September 10, 2021, had voted to approve the Merger.[19] The press release added that "Greenidge and Support.com will announce the targeted closing date and final exchange ratio in the merger when determined."

84. Also on September 10, 2021, at 4:48 p.m. E.T, after the market for Support Common Stock had closed for the day, Support filed a Form 8-K with the SEC stating that Support's stockholders had considered and voted in favor of adoption of the Merger Agreement,

---

[19]     www.bloomberg.com/press-releases/2021-09-10/support-com-stockholders-approve-merger-with-greenidge-generation-holdings-inc.

and providing the results of the vote.[20]   The Form 8-K was signed by Rosenzweig on behalf of

Support and attached as Exhibit 99.1, and incorporated by reference, a copy of Support's

September 10, 2021 Press Release.[21]

85.   On September 10, 2021, the price of Support Common Stock closed at $21.00 per

share on trading volume of 29,911,627 shares.

86.   On Monday September 13, 2021, at approximately 9:01 a.m. ET, before the Market

for Support Common Stock opened for the day, Greenidge and Support issued a joint press release

("September 13, 2021 Press Release"), announcing that the Merger would close on September 14,

2021, Greenidge Class A Common Stock would begin trading on September 15, 2021, the

Exchange Ratio would be 0.115, and each share of Support Common Stock would be

"automatically converted into the right to receive 0.115 shares of Greenidge Class A common

stock, plus cash in lieu of any fractional shares of Greenidge Class A common stock resulting from

such calculation:"[22]

> Support.com and Greenidge Generation Holdings Inc. Announce Update on
> Merger Closing
>
> Los Angeles, CA and Dresden, NY– September 13, 2021 – Support.com, Inc.
> (NASDAQ: SPRT), a leader in customer and technical support solutions delivered
> by home-based employees, and Greenidge Generation Holdings Inc.
> ("Greenidge"), a vertically integrated bitcoin mining and power generation
> company, today announced an update regarding their previously announced
> pending merger transaction.   The parties expect the pending merger to close and
> become effective at the close of trading on September 14, 2021 (subject to the
> satisfaction or waiver of all closing conditions contained in the merger agreement),
> and shares of Greenidge Class A common stock to begin trading on The Nasdaq
> Global Select Market under the ticker symbol "GREE" on September 15, 2021.

---

[20] www.sec.gov/ix?doc=/Archives/edgar/data/1104855/000119312521270074/d181694d8k.htm.

[21] www.sec.gov/Archives/edgar/data/1104855/000119312521270074/d181694dex991.htm.

[22]   www.bloomberg.com/press-releases/2021-09-13/support-com-and-greenidge-generation-holdings-inc-
announce-update-on-merger-closing.

In addition, pursuant to the terms of the merger agreement, the parties are announcing the final exchange ratio for the exchange of shares in the pending merger. Subject to the terms and conditions of the merger agreement, at the effective time of the merger, ***each share of Support.com, Inc. common stock issued and outstanding immediately prior to the effective time will be cancelled and extinguished and automatically converted into the right to receive 0.115 shares of Greenidge Class A common stock, <u>plus cash in lieu of any fractional shares</u>*** of Greenidge Class A common stock resulting from such calculation.

(emphasis added).

87.    Also on September 13, 2021, at approximately 10:04 a.m. ET, Greenidge filed a Form 8-K with the SEC ("Greenidge September 13, 2021 Form 8-K") announcing that the Merger would close on September 14, 2021, Greenidge Class A Common Stock would begin trading on September 15, 2021, the Exchange Ratio would be 0.115, and each share of Support Common Stock would be "automatically converted into the right to receive 0.115 shares []of [Greenidge Class A Common Stock], plus cash in lieu of any fractional shares of [Greenidge] Class A Common Stock:"[23]

> As previously disclosed, on March 19, 2021, Greenidge Generation Holdings Inc. (the "Company"), Support.com, Inc. (the "Support.com") and GGH Merger Sub, Inc. ("Merger Sub") entered into an Agreement and Plan of Merger (the "Merger Agreement"). Upon the terms and subject to the conditions described in the Merger Agreement, Merger Sub will be merged with and into Support.com (the "Merger"), with Support.com surviving the Merger as a wholly owned subsidiary of the Company.
>
> Pursuant to the Merger Agreement, at the effective time of the Merger (the "Effective Time"), each share of Support.com common stock, par value $0.0001 per share, issued and outstanding immediately prior to the Effective Time will be ***cancelled and extinguished and automatically converted into the right to receive 0.115 shares (the "Exchange Ratio") of the Company's [Greenidge] Class A common stock, par value $0.0001 per share ("Company Class A Common Stock"), <u>plus cash in lieu of any fractional shares</u>*** of Company Class A Common Stock.
>
> On September 13, 2021, the Company and Support.com issued a joint press release announcing the Exchange Ratio, that the Merger is expected to close on September 14, 2021 (subject to the satisfaction or waiver of all closing conditions contained in

---

[23] www.sec.gov/Archives/edgar/data/1844971/000119312521271020/d220144d8k.htm.

the Merger Agreement) and that the Company Class A Common Stock is expected to begin trading on The Nasdaq Global Select Market under the ticker symbol "GREE" on September 15, 2021. The full text of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

88.     The Greenidge September 13, 2021 Form 8-K was signed by Kirt on behalf of Greenidge, and attached as Exhibit 99.1, and incorporated by reference, a copy of the September 13, 2021 Press Release.[24]

89.     On September 13, 2021, the price of Support Common Stock closed at $19.10 per share on trading volume of 17,600,548 shares.

90.     On September 14, 2021 at 4:39 p.m. ET, after the market for Support Common Stock had closed for the day, Support filed a Form 8-K with the SEC announcing, among other things, that the Merger had closed on September 14, 2021 and the Exchange Ratio was 0.115 shares of Greenidge Class A Common Stock ("September 14, 2021 Form 8-K"):[25]

Introductory Note

As previously disclosed, Support.com, Inc., a Delaware corporation [], entered into an Agreement and Plan of Merger dated as of March 19, 2021 (the "Merger Agreement") with Greenidge Generation Holdings Inc., a Delaware corporation ("Greenidge"), and GGH Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Greenidge ("Merger Sub"). On September 14, 2021, pursuant to the terms and conditions of the Merger Agreement, Merger Sub was merged with and into [Support] (the "Merger"), with [Support] surviving as a wholly owned subsidiary of Greenidge (the "Surviving Corporation").

The foregoing description of the Merger and the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Merger Agreement, which is included as Exhibit 2.1 to the Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") by [Support] on March 22, 2021 and is incorporated by reference herein.

Item 2.01.     Completion of Acquisition or Disposition of Assets.

---

[24] www.sec.gov/Archives/edgar/data/1844971/000119312521271020/d220144dex991.htm.

[25] www.sec.gov/ix?doc=/Archives/edgar/data/1104855/000119312521272911/d225961d8k.htm.

At the effective time of the Merger (the "Effective Time"), (i) each share of common stock, par value $0.0001, of [Support] issued and outstanding immediately prior to the Effective Time was cancelled and extinguished and automatically converted into the right to receive 0.115 shares (the "Exchange Ratio") of Class A Common Stock, par value $0.0001, of Greenidge (the "Greenidge Class A Common Stock") ….

Item 3.01.     Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.

In connection with the consummation of the Merger, the Company notified representatives of The Nasdaq Stock Market LLC (Nasdaq Capital Market) ("NASDAQ") that the Merger had been completed and requested that NASDAQ delist the Company Common Stock. As a result, trading of the Company Common Stock, which traded under the ticker symbol "SPRT" on NASDAQ, was suspended after the close of trading on NASDAQ on September 14, 2021. In addition, the Company requested that NASDAQ file with the SEC a Notification of Removal from Listing and/or Registration under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), on Form 25 in order to effect the delisting of the shares of the Company Common Stock from NASDAQ and deregistration of such shares under Section 12(b) of the Exchange Act. The Company also intends to file with the SEC a Form 15 under the Exchange Act requesting the deregistration of the shares of the Company Common Stock under Section 12(g) of the Exchange Act and the suspension of the Company's reporting obligations under Sections 13 and 15(d) of the Exchange Act.

91.     The September 14, 2021 Form 8-K was signed by Rosenzweig on behalf of Support.

92.     The September 14, 2021 Form 8-K attached as Exhibit 2.1, and incorporated by reference a copy of the Merger Agreement.[26]

93.     Because at the time the September 14, 2021 Form 8-K was filed the Merger had closed, and Support had become a wholly owned subsidiary of Greenidge, the September 14, 2021 Form 8-K was filed and made on behalf of Greenidge.

94.     Also on September 14, 2021, at approximately 4:46 p.m. ET, Greenidge issued a press release announcing that the Merger had closed on September 14, 2021 and that the Exchange

---

[26] www.sec.gov/Archives/edgar/data/1104855/000119312521088364/d122974dex21.htm.

Ratio was 0.115 shares of Greenidge Class A Common Stock for each share of Support Common

Stock ("September 14, 2021 Press Release"):[27]

> DRESDEN, N.Y., September 14, 2021 – Greenidge Generation Holdings Inc. (NASDAQ: GREE) ("Greenidge" or the "Company"), a vertically integrated bitcoin mining and power generation company, has closed its previously announced merger with Support.com, Inc. ("Support.com") (formerly NASDAQ: SPRT).

> Greenidge expects its Class A Common Stock to commence trading tomorrow morning on the NASDAQ Global Select Market ("NASDAQ") under the ticker "GREE." Support.com will continue to operate its existing lines of business as a wholly owned subsidiary of Greenidge.  The combined company will be led by Greenidge Chief Executive Officer Jeff Kirt.

> "The completion of this transaction marks a critical milestone in our journey, expanding our industry leadership as the first publicly traded, vertically integrated power generation and bitcoin miner of scale in North America," Kirt said. "We are poised to create significant value by combining public market growth capital with our 100% carbon-neutral bitcoin mining business model as we expand our operations to additional locations, including our anticipated South Carolina facility."

> As previously announced, the exchange ratio for the merger has been determined and Support.com shareholders will receive 0.115 shares of Greenidge Class A Common Stock for each share of Support.com Common Stock held prior to closing.

> A Form 8-K containing more detailed information regarding the merger transaction will be filed with the Securities and Exchange Commission.

95.    On September 14, 2021, the price of Support Common Stock closed at $11.80 per

share, on trading volume of 50,179,617 shares.

96.    On September 15, 2021, at 8:28 a.m. ET, before the market for Greenidge Class A

Common Stock opened for the day, Greenidge filed a Form 8-K with the SEC stating that the

Merger had closed and the Exchange Ratio was 0.115 shares of Greenidge Class A Common Stock

("September 15, 2021 Form 8-K"):[28]

---

[27] www.prnewswire.com/news-releases/greenidge-generation-announces-closing-of-merger-with-supportcom-301376856.html.

[28] www.sec.gov/Archives/edgar/data/0001844971/000119312521273493/d163523d8k.htm.

Introductory Note

On September 14, 2021, GGH Merger Sub, Inc., a Delaware corporation ("Merger Sub") and a wholly owned subsidiary of Greenidge Generation Holdings Inc., a Delaware corporation (the "Company"), merged with and into Support.com, Inc., a Delaware corporation ("Support"), with Support continuing as the surviving corporation (the "Merger") and a wholly owned subsidiary of the Company [Greenidge], pursuant to the previously announced Agreement and Plan of Merger, dated March 19, 2021 (the "Merger Agreement"), among the Company [Greenidge], Support and Merger Sub.

Item 2.01

Completion of Acquisition or Disposition of Assets.

The information set forth under the Introductory Notes is incorporated by reference into this Item 2.01.

At the effective time of the Merger (the "Effective Time"): (i) each share of common stock, par value $0.0001, of Support (the "Support Common Stock") issued and outstanding immediately prior to the Effective Time was cancelled and extinguished and automatically converted into the right to receive 0.115 (the "Exchange Ratio") shares of Class A Common Stock, par value $0.0001, of the [Greenidge]…

The foregoing description of the effects of the Merger and the Merger Agreement, and the transactions contemplated thereby, does not purport to be complete and is subject to, and qualified in its entirety by reference to, the full text of the Merger Agreement.  A copy of the Merger Agreement was included as Annex A to the proxy statement/prospectus forming part of the Company's Registration Statement on Form S-4 filed with the Securities and Exchange Commission (the "SEC") on May 4, 2021, and is incorporated by reference into this Item 2.01.

97.     The September 15, 2021 Form 8-K was signed by Kirt on behalf of Greenidge, and

attached as Exhibit 99.1, and incorporated by reference, a copy of the September 14, 2021 Press

Release.[29]

98.     The September 15, 2021 Form 8-K also attached as Exhibit 2.1, and incorporated

by reference, a copy of the Proxy.[30]

---

[29] www.sec.gov/Archives/edgar/data/0001844971/000119312521273493/d163523dex991.htm.

[30] www.sec.gov/Archives/edgar/data/1844971/000119312521149057/d166032ds4.htm.

99.     According to Bloomberg, on September 15, 2021, the first day of public trading for Greenidge Class A Common Stock, the stock opened at $56.9965 per share and closed at $43.40 per share, with an intraday high price of $60.00 per share and intraday low price of $39.30 per share, on trading volume of 7,790,455 shares.

**H.      The Calculation Payment of the Fractional Share Consideration As Set Forth in the Merger Agreement and Proxy**

100.    As alleged above, the Fractional Share Consideration to be paid to holders of Support Capital Stock was to be calculated by multiplying the fractional shares of Greenidge Class A Capital Stock the holder of Support Capital Stock was to receive by the quotient of the Support Closing Price (the volume weighted average trading price per share of Support Common Stock for the ten trading day period ending on and including the close of business on the Exercise Calculation Date (the second Business Day immediately preceding the Closing)) divided by (y) the Exchange Ratio.  Merger Agreement §§ 1.01, 3.01.

101.    The calculation of the Fractional Share Consideration under the terms of the Proxy is identical.  The Proxy provided that:

> Greenidge will pay to each holder of Support common stock who would have otherwise received a fractional share of class A common stock, an amount of cash (rounded to the nearest whole cent), without interest, equal to the number of such fractional shares for which such holder of Support common stock would be entitled to receive multiplied by the quotient of (x) the VWAP divided by (y) the Exchange Ratio.

Proxy at 99.[31]

102.    As of at latest 9:21 a.m. ET on September 13, 2021, when Greenidge and Support announced the Exchange Ratio of 0.115 and that the Merger would close on September 14, 2021

---

[31] VWAP was defined by the Proxy to be "the volume weighted average trading price per share of Support common stock for the ten-trading day period ending on and including the second business day immediately preceding the Closing Date," or, in other words, the Support Closing Price (as set forth in the Merger Agreement).  Proxy at 5.

(making the Exercise Calculation date September 10, 2021), it was possible to calculate the per share Fractional Share Consideration amount called for by the Merger Agreement and Proxy.

103.    The ten trading days prior to and including September 10, 2021 were August 27, 30, 31, and September 1, 2, 3, 7, 8, 9, and 10.  Monday September 6, 2021 was Labor Day, and was a date in which the NasdaqGS stock exchange was closed.[32]

104.    According to Bloomberg, the per share closing prices and daily trading volumes of Support Common Stock for the ten trading days prior to and including September 10, 2021 were:

| Date | Per Share Closing Price of Support Common Stock | Daily Trading Volume of Support Common Stock |
|---|---|---|
| 8/27/2021 | $26.33 | 166,543,364 |
| 8/30/2021 | $36.39 | 72,953,395 |
| 8/31/2021 | $31.36 | 29,056,971 |
| 9/1/2021 | $24.10 | 28,010,832 |
| 9/2/2021 | $22.00 | 29,430,444 |
| 9/3/2021 | $21.95 | 20,836,413 |
| 9/6/2021 | Labor Day – Market Closed | Labor Day – Market Closed |
| 9/7/2021 | $19.30 | 20,102,763 |
| 9/8/2021 | $23.16 | 29,065,784 |
| 9/9/2021 | $26.02 | 63,524,698 |
| 9/10/2021 | $21.00 | 29,911,627 |

105.    According to Bloomberg, the volume weighted average trading price per share of Support Common Stock for the ten trading days prior to and including September 10, 2021 (excluding September 6, 2021) was $32.4073, including pre-market August 27 and post-market September 10, 2021 trades:[33]

---

[32] www.nasdaq.com/market-activity/stock-market-holiday-calendar.

[33] The hours on the chart are expressed in Pacific Standard Time.



106.    Therefore, the Fractional Share Consideration, calculated under the terms of the Merger Agreement and Proxy, was $281.80 ($32.4073 Support Closing Price / 0.115 Exchange Ratio) per share of Greenidge Class A Common Stock.

107.    Accordingly, for example, pursuant to the Merger Agreement and Proxy, upon completion of the Merger, a beneficial owner of 100 shares of Support Common Stock would be entitled to receive 11.5 shares of Greenidge Class A Common Stock (100 shares x 0.115 Exchange Ratio), but would receive cash in the amount of $140.90 in lieu in lieu of the 0.5 fractional share of Greenidge Class A Common Stock (0.5 fractional shares x $281.80).

108.    Of note, after the S-4 was deemed effective on August 10, 2021 at 4:00 p.m. ET and the Proxy was filed on August 10, 2021 at 4:22 p.m., the price and trading volume of Support Common Stock increased significantly.

109.    According to Bloomberg, the daily per share closing prices and daily trading volume of Support Common Stock from August 10, 2021 (the day the Proxy was filed) to September 14, 2021 (the day the Merger closed) were:

| Date | Per Share Closing Price of Support Common Stock | Daily Trading Volume of Support Common Stock |
|---|---|---|
| 8/10/2021 | $7.45 | 2,932,958 |
| 8/11/2021 | $7.17 | 3,069,185 |
| 8/12/2021 | $7.94 | 7,032,884 |
| 8/13/2021 | $8.10 | 83,501,140 |
| 8/16/2021 | $7.84 | 8,880,780 |
| 8/17/2021 | $8.38 | 6,895,034 |
| 8/18/2021 | $8.14 | 4,894,446 |
| 8/19/2021 | $8.77 | 5,066,609 |
| 8/20/2021 | $8.81 | 29,067,513 |
| 8/23/2021 | $11.17 | 32,615,387 |
| 8/24/2021 | $11.67 | 80,740,511 |
| 8/25/2021 | $13.96 | 51,990,713 |
| 8/26/2021 | $19.70 | 105,897,920 |
| 8/27/2021 | $26.33 | 166,543,364 |
| 8/30/2021 | $36.39 | 72,953,395 |
| 8/31/2021 | $31.36 | 29,056,971 |
| 9/1/2021 | $24.10 | 28,010,832 |
| 9/2/2021 | $22.00 | 29,010,832 |
| 9/3/2021 | $21.95 | 20,836,413 |
| 9/6/2021 (Labor Day) | Markets Closed | Markets Closed |
| 9/7/2021 | $19.30 | 20,102,763 |
| 9/8/2021 | $23.16 | 29,065,784 |
| 9/9/2021 | $26.02 | 63,524,698 |
| 9/10/2021 | $21.00 | 29,911,627 |
| 9/13/2021 (Closing Announced) | $19.10 | 17,600,548 |
| 9/14/2021 (Merger Closes) | $11.80 | 50,179,617 |

110.    These per share prices for Support Common Stock were significantly higher than the prices that Support Common Stock had traded at since the Merger was announced.  According to Bloomberg, from March 22, 2021 (the day the Merger was announced) to August 10, 2021 (the day the Proxy was filed), the average closing price of Support Common Stock was $4.2154 per share and the average daily trading volume of Support Common Stock was 3,319,397.  The high

trading price for Support Common Stock during this period was $8.97 per share on July 28, 2021, and its low trading price during this period was $2.48 per share on May 13, 2021.

111.    The Support Closing Price calculated using the ten trading days ending September 10, 2021 was also significantly higher than the volume weighted average trading prices for Support Common Stock that Defendants anticipated would be used to pay the Fractional Share Consideration.

112.    The Proxy contained illustrative information on what Support Stockholders would receive in the Merger.  Proxy 65-66.  As part of that information, the Proxy contained a table to "show[] illustrative Exchange Ratios at various assumed VWAPs."  Proxy at 65-66.  The table "assume[d] there are outstanding 24,237,876 shares of Support common stock, 130,507 Support awards and 1,690,615 Support options with an average exercise price of $1.68."  Proxy at 65.  The Proxy further stated that "[i]n the table below, $2.14 is the closing sale price per share of Support's common stock on March 19, 2021, the last trading day prior to the date of public announcement of the execution of the Merger Agreement, and $7.94 is the VWAP for the ten-trading day period ending on August 9, 2021."

| VWAP of Support Common Stock | Exchange Ratio |
|:---:|:---:|
| $2.14 | 0.121 |
| $4.00 | 0.118 |
| $5.00 | 0.118 |
| $6.00 | 0.117 |
| $7.00 | 0.117 |
| $7.94 | 0.117 |
| $8.00 | 0.117 |

Proxy at 65-66.[34]

---

[34] The illustrative VWAP and Exchange Ratio chart has been retyped to make it easier to read than an image of the chart included in the Proxy.

113.    These illustrative VWAPs and Exchange Ratios imply illustrative Fractional Share Considerations that could be paid to beneficial owners of Support Capital Stock who were entitled to receive fractional shares of Greenidge Class A Common Stock in the Merger significantly below $281.80 per whole share of Greenidge Class A Common Stock:

| Illustrative VWAP of Support Common Stock | Illustrative Exchange Ratio | Illustrative Fractional Share Consideration (VWAP / Exchange Ratio) Per Whole Share of Greenidge Class A Common Stock |
|---|---|---|
| $2.14 | 0.121 | $17.69 |
| $4.00 | 0.118 | $33.90 |
| $5.00 | 0.118 | $42.37 |
| $6.00 | 0.117 | $51.28 |
| $7.00 | 0.117 | $59.83 |
| $7.94 | 0.117 | $67.86 |
| $8.00 | 0.117 | $68.38 |

114.    As a result, the Fractional Share Consideration of $281.80 per whole share of Greenidge Class A Common Stock resulting from the Exchange Ratio announced on September 13, 2021 (0.115) and Support Closing Price calculated for the ten trading days ending on September 10, 2021 ($32.4073), which the Merger Agreement and Proxy required to be paid to beneficial owners of Support Capital Stock who were entitled to receive fractional shares of Greenidge Class A Common Stock in the Merger, was significantly higher than Greenidge expected to pay when it entered into the Merger Agreement and issued the preliminary and final Proxy(ies).

I.    **Defendants' Payment of the Fractional Share Consideration**

115.    On September 14, 2021, DTC informed its participants that "DTC will be treated as one holder, therefore, cash in lieu will be paid out on a participant level at a rate to be determined."

116.   Defendants never informed the public that DTC would be treated as a single holder of Support Capital Stock, and its treatment of DTC as a single holder conflicted with the actual language of the Proxy and Merger Agreement.

117.   On September 17, 2021, DTC informed its participants that:

Participants are advised that the Cash-in-lieu rate is $232.35 per share.  Per the issuer, the rate was based on the quotient of (a) the volume weighted average trading price per share of Support common stock for the ten trading day period ending on and including September 10, 2021 divided by (b) The Exchange Ratio.

10 day VWAP: $26.72

Exchange ratio: 0.115

Final calculation: $26.72 / 0.115 = $232.35

DTC will allocate Cash-in-lieu upon receipt of funds from the agent.

118.   The VWAP used to calculate the Fractional Share Consideration was incorrect, and appears to have included Labor Day, which was not a trading day, instead of August 27, 2021.

119.   On September 22, 2021, DTC informed its participants that Greenidge had aggregated all Support Capital Stock at the DTC level, and as a result paid DTC for only a single fractional share of Greenidge Class A Common Stock.  DTC further stated that it had asked Greenidge to provide additional funding to pay Fractional Share Consideration, but that Greenidge had refused:

Participants are advised that on the closing date of the merger, September 14, the issuer [Greenidge] provided cash funding to Computershare, the exchange agent for the merger, to satisfy the issuer's obligation under its merger agreement with Support.com to pay cash in lieu (-CIL-) of any fractional shares owed record holders of Support.com.  ***The CIL funding provided by the issuer [Greenidge] on the closing date aggregated all shares held by DTC as a record holder; DTC received CIL funding for only one fractional share from Computershare. Subsequently, on September 16, DTC requested that the issuer [Greenidge] provide CIL funding for DTC participants.  The issuer [Greenidge] considered providing such funding but ultimately declined to provide such additional funding to DTC on September 20***.  Any prior communications to the contrary were the result of premature communications to DTC that were neither final nor correct.

36

As a result, DTC was treated as one holder and CIL will be paid tomorrow (September 23, 2021) at the participant level at a rate of $28.64. DTC does allocate entitlements of $2.50 or less.

(emphasis added).

120.    In effect, rather than paying DTC the aggregate Fractional Share Consideration owed to all beneficial owners of Support Capital Stock who held their shares through DTC's participants, Defendants aggregated all the fractional shares owed to the beneficial owners of Support Capital Stock and paid DTC for those fractional shares in whole shares of Greenidge Class A Common Stock and cash for a single fractional share.

121.    The impact of treating DTC (a clearing agency that held immovable fungible bulk shares of Support Capital Stock for its participants, such as brokers, dealers, custodians, and other intermediaries) as a single holder and paying DTC in whole shares of Greenidge Class A Common Stock and cash for a single fractional Greenidge Class A Common Stock share, rather than paying the Fractional Share Consideration to the beneficial holders of Support Capital Stock (the holders of Support Capital Stock entitled to receive fractional shares of Greenidge Class A Common stock), was significant.

122.    In order to pay the beneficial holders of Support Common Stock for the fractional shares of Greenidge Class A Common Stock the beneficial owners were entitled to receive, DTC and/or DTC's participants were left to sell the whole shares of Greenidge Class A Common Stock received from Greenidge instead of cash for fractional shares at then-current market prices.

123.    While Greenidge Class A Common Stock had opened at $56.9965 per share on September 15, 2021, its first day of trading, the price of Greenidge Class A Common Stock declined significantly in the days that followed, and closed at $25.40 on September 23, 2021, the day that cash in lieu of fractional shares of Greenidge Class A Common Stock was paid.

124. According to Bloomberg, Greenidge Class A Common Stock's high price between September 15 and 23, 2021 was $60.00 per share on September 15, 2021, and its low price during this period was $25.23 per share on September 23, 2021, between 21.3% and 8.9% of the $281.80 Fractional Share Consideration amount that resulted from the formula set forth in the Merger Agreement and Proxy.

125. According to Bloomberg, the per share closing prices and daily trading volumes of Greenidge Class A Common Stock between September 15 and 23, 2021 were:

| Date | Per Share Closing Price of Greenidge Class A Common Stock | Daily Trading Volume of Greenidge Class A Common Stock |
|------|-----------------------------------------------------------|--------------------------------------------------------|
| 9/15/2021 | $43.40 | 7,790,455 |
| 9/16/2021 | $43.50 | 4,120,166 |
| 9/17/2021 | $39.70 | 3,200,195 |
| 9/20/2021 | $30.78 | 3,849,892 |
| 9/21/2021 | $30.14 | 4,154,227 |
| 9/22/2021 | $29.09 | 2,906,935 |
| 9/23/2021 | $25.40 | 2,762,561 |

126. Therefore, the prices at which DTC and its participants sold the whole shares of Greenidge Class A Common Stock in order to pay the beneficial owners of Support Capital Stock entitled to receive fractional shares of Greenidge Class A Common Stock were substantially below the $281.80 per whole share of Greenidge Class A Common Stock that resulted from the Fractional Share Consideration formula set forth in the Merger Agreement and Proxy

127. As a result of Defendants' actions and fraud, the cash in lieu of fractional shares of Greenidge Class A Common Stock was paid at the rate of $28.64 per whole share of Greenidge Class A Common Stock, 10.16% of the $281.80 per share of Greenidge Class A Common Stock that resulted from the Fractional Share Consideration formula in the Merger Agreement and Proxy.

128.     By treating DTC as a single holder of Support Capital Stock, Greenidge saved itself what is likely millions of dollars in cash that it otherwise would have had to pay to the beneficial owners of Support Capital Stock who held their shares through DTC participants.

129.     By treating DTC as a single holder of Support Capital Stock, Greenidge was able to pay for fractional shares in whole shares of Greenidge Class A Common Stock, rather than paying beneficial owners for their fractional shares of Greenidge Class A Common Stock at the rate of $281.80 per whole share.

130.     Defendants knew that treating DTC as a single holder, aggregating all fractional shares at the DTC level, and paying DTC in whole shares of Greenidge Class A Common Stock and cash for a single fractional share of Greenidge Class A Common Stock, would save it millions of dollars.

131.     On September 10, 2021 (the last trading day before Defendants made their September 13, 2021 announcement of the Exchange Ratio and that the Merger would close on September 14, 2021, the Support Common Stock closed at $21.00 per share.

132.     According to the 24,237,876 shares of Support Common Stock, 130,507 Support awards, and 1,690,615 Support options assumed to be outstanding by Greenidge in the Proxy as part of the illustrative Exchange Ratios and assumed VWAPs information (*see* paragraph 112), at $21.00 per share, Support had an implied market capitalization of between $508,995,396 (only Support Common Stock) and $547,238,958 (Support Common Stock and Support equity awards).

133.     These market capitalizations implied a per-share value of the 2,998,261 shares of Greenidge Class A Common Stock of $169.76 per share or $182.52 per share, $112.04 or $99.28 less than the $281.80 Fractional Share Consideration that resulted from the formula set forth in the Merger Agreement and Proxy.

134.     According to Bloomberg, on September 16, 2021, the date DTC asked Greenidge to provide additional funds to pay cash in lieu of fractional shares of Greenidge Class A Common Stock, Greenidge Class A Common Stock opened at $44.01 per share, closed at $43.50 per share, and had a high trading price of $50.25 per share and a low trading price of $42.18 per share.  These values are between $231.55 per share and $239.62 per share less than the $281.80 Fractional Share Consideration that resulted from the formula set forth in the Merger Agreement and Proxy.

135.     Therefore, based on this information, which was readily available to Defendants, Defendants knew that paying DTC in whole shares of Greenidge Class A Common stock was significantly cheaper than paying cash for fractional shares of Greenidge Class A Common Stock to beneficial owners at the rate of $281.80 per whole share of Greenidge Class A Common Stock.

136.     While the exact number of beneficial owners of Support Capital Stock who were entitled to receive fractional shares of Greenidge Class A Common Stock is not known, there is strong inference that the number is significant.

137.     The significant increase in stock price and trading volume in days leading up to the closing of the Merger implies that a significant number of investors were purchasing Support Common Stock in order to receive the Merger Consideration and Fractional Share Consideration.

138.     Further, it was public knowledge that Support Common Stock was a "meme stock," and that retail investors were buying a significant number of shares of Support Common Stock,[35] resulting in there being a significant number of beneficial holders of Support Capital Stock.

139.     At the exchange ratio of 0.115, any investor that held shares of Support Common Stock in an amount other than multiples of 200 would have been entitled to receive fractional

---

[35] *Support.com Rides Meme-Stock Wave to Another Big Gain*, thestreet.com (Aug. 30, 2011), available at www.thestreet.com/investing/support-dot-com-higher-for-eighth-day-meme-stock.

shares of Greenidge Class A Common Stock, a calculation that would have been available to the Defendants on September 13, 2021.  *See* Appendix 1 hereto.

140.    Therefore, there is a strong presumption that almost all beneficial owners of Support Common Stock were entitled to receive fractional shares of Greenidge Class A Common Stock and the Fractional Share Consideration.

### J.    The Merger's Impact on Support Exchange Traded Options

141.    On September 14, 2021, OCC informed investors in options for Support Common Stock that each outstanding exchange traded option contract for Support Common Stock, each originally referencing 100 shares of Support Common Stock, would be adjusted to call for the delivery of 11 shares of Greenidge Class A Common Stock plus cash in lieu of 0.5 shares of Greenidge Class A Common Stock at a rate to be determined (as adjusted, "GREE1" or the "GREE1 Options").

142.    On September 15, 2021, as a result of the closing of the merger and the listing of Greenidge Class A Common Stock, all outstanding options for Support Common Stock were adjusted to GREE1 options.

143.    On September 24, 2021, OCC, relying on the $28.64 per whole share of Greenidge Class A Common Stock amount as noticed by DTC on September 22, 2021, informed investors that cash in lieu of 0.5 fractional shares of Greenidge Class A Common Stock portion of GREE1 options would be settled at $14.32 per 0.5 fractional share:

> Support.com, Inc. options were adjusted on September 15, 2021 (See OCC Information Memo #49251).  The new deliverable became 1) 11 Greenidge Generation Holdings Inc. (GREE) Class A Common Shares, and 2) Cash in lieu of 0.5 fractional GREE shares.  Only settlement of the cash portion of GREE1 options exercise/assignment activity was subject to delayed settlement.
>
> ***OCC has been informed that a price of $28.64 per whole GREE share will be used to determine the cash in lieu amount.***  Accordingly, the cash in lieu amount is:

0.5 x $28.64 = $14.32 per GREE1 Contract

Now that the exact cash in lieu amount has been determined, OCC will require Put exercisers and Call assignees, during the period of September 15, 2021 through September 24, 2021, to deliver the appropriate cash amount.

The cash in lieu of fractional share portion of the option deliverable remains fixed and does not vary with price changes of any security.

Terms of the GREE1 options are as follows:

New Deliverable Per Contract: 1) 11 Greenidge Generation Holdings Inc. (GREE) Class A Common Shares; 2) $14.32 Cash

Strike Prices: Unchanged

CUSIP: GREE: 39531G100

Multiplier: 100 (i.e., a premium of 1.50 yields $150)

Settlement

The GREE component of GREE1 exercise/assignment activity from September 15, 2021 through September 23, 2021, has settled through National Security Clearing Corporation (NSCC).  The $14.32 cash amount will be settled by OCC.

Pricing

The underlying price for GREE1 will be determined as follows:  GREE1 = 0.11 (GREE) + 0.1432

For example, if GREE closes at 29.00, the GREE1 price would be calculated as follows:

GREE1 = 0.11 (29.00) + 0.1432 = 3.33

Disclaimer

This Information Memo provides an unofficial summary of the terms of corporate events affecting listed options or futures prepared for the convenience of market participants.  OCC accepts no responsibility for the accuracy or completeness of the summary, particularly for information which may be relevant to investment decisions.  Option or futures investors should independently ascertain and evaluate all information concerning this corporate event(s).

The determination to adjust options and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article VI, Sections 11 and 11A.  The determination to adjust futures and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article XII, Sections 3, 4, or 4A, as applicable.  For

both options and futures, each adjustment decision is made on a case by case basis. Adjustment decisions are based on information available at the time and are subject to change as additional information becomes available or if there are material changes to the terms of the corporate event(s) occasioning the adjustment.

ALL CLEARING MEMBERS ARE REQUESTED TO IMMEDIATELY ADVISE ALL BRANCH OFFICES AND CORRESPONDENTS ON THE ABOVE.

(emphasis added).

144.    Greenidge's decision to pay the Fractional Share Consideration contrary to the terms of the Proxy and the Merger Agreement had the direct result of causing the cash in lieu portion of GREE1 options to be $28.64 per share of Greenidge Class A Common Stock/$14.32 per 0.5 share of Greenidge Class A Common Stock, approximately one tenth of the $281.80 per whole share Fractional Share Consideration called for in the Merger Agreement and Proxy.

### K.    Defendants' Materially False and Misleading Statements or Omissions of Material Fact

145.    As alleged below, Defendants' statements concerning the payment of Fractional Share Consideration were materially false and misleading in violation Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, in the alternative, constituted common law fraud.

146.    Investors who traded in Support Common Stock and options for Support Common Stock and Greenidge Class A Common Stock were entitled to rely on the truth and accuracy of Defendants' public statements.

147.    Defendants Greenidge and Kirt made the following statements in the Merger Agreement on March 19, 2021, in the copies of the Merger Agreement attached to or incorporated in the Form S-4s filed with the SEC on May 4, 2021, June 25, 2021, July 16, 2021, August 6, 2021, and in the copy of the Merger Agreement attached to or incorporated in Proxy filed with the SEC on August 10, 2021:

**[FS1]** At the Effective Time, by virtue of the Merger and without any action on the part of Pubco [Support], Merger Sub, the Company [Greenidge] or their respective stockholders, each share of Pubco [Support] Capital Stock issued and outstanding immediately prior to the Effective Time (each such share of Pubco [Support] Capital Stock a "Share" and collectively, the "Shares") shall be canceled and converted into the right to receive the Per Share Merger Consideration, and each holder of certificates ("Certificates") or book-entry shares ("Book-Entry Shares") which immediately prior to the Effective Time represented such Shares shall thereafter cease to have any rights with respect thereto except the right to receive the Per Share Merger Consideration, in each case to be issued or paid, without interest, in consideration therefor.[36]

**[FS2]** No fractional shares of Company [Greenidge] Class A Common Stock shall be issued in connection with the Merger, and no certificates or scrip for any such fractional shares shall be issued.  Any Pubco [Support] Stockholder who would otherwise be entitled to receive a fraction of a share of Company [Greenidge] Class A Common Stock (after aggregating all fractional shares of Company [Greenidge] Class A Common Stock issuable to such holder) shall, in lieu of such fraction of a share, be paid in cash the dollar amount (rounded to the nearest whole cent), without interest, determined by multiplying such fraction by the quotient of (x) the Pubco [Support] Closing Price divided by (y) the Exchange Ratio (such product, the "Fractional Share Consideration").

**[FS3]** Immediately prior to the Effective Time, the Company shall deposit, or cause to be deposited, with the Exchange Agent (i) evidence of the Company [Greenidge] Class A Common Stock issuable pursuant to Section 3.01 and Section 3.04 in book-entry form equal to the Merger Consideration (excluding any Fractional Share Consideration), and (ii) cash in immediately available funds in an amount sufficient to pay the aggregate Fractional Share Consideration (such evidence of book-entry shares of Company Class A Common Stock and cash amounts, together with any dividends or other distributions with respect thereto, the "**Exchange Fund**"), in each case, for the sole benefit of the holders of shares of Pubco Capital Stock.

**[FS4]** In the event the Exchange Fund shall be insufficient to pay the aggregate Fractional Share Consideration, the Company shall promptly deposit, or cause to be promptly deposited, additional funds with the Exchange Agent in an amount which is equal to the deficiency in the amount required to make such payment.

**[FS5]** The Company shall cause the Exchange Agent to make, and the Exchange Agent shall make, delivery of the Merger Consideration, including payment of the Fractional Share Consideration out of the Exchange Fund in accordance with this Agreement.

---

[36] [FS__] is used to provide an identification number for each alleged false and misleading statement. Underlined text (where applicable) is used to identify false and misleading statements when the additional of other text is included for context.

**[FS6]** The Exchange Fund shall not be used for any purpose that is not expressly provided for in this Agreement.

**[FS7]** In the event of a transfer of ownership of shares of Pubco [Support] Capital Stock that is not registered in the transfer or stock records of Pubco [Support], any cash to be paid upon, or shares of Company [Greenidge] Class A Common Stock to be issued upon, due surrender of the Certificate or Book-Entry Share formerly representing such shares of Pubco [Support] Capital Stock may be paid or issued, as the case may be, to such a transferee if such Certificate or Book-Entry Share is presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer or other similar Taxes have been paid or are not applicable.  Until surrendered as contemplated by this Section 3.03, each Certificate and Book-Entry Share shall be deemed at any time after the Effective Time to represent only the right to receive the applicable Merger Consideration as contemplated by Section 3.01, including any amount payable in respect of Fractional Share Consideration.

148.     Defendants Greenidge and Kirt made the following statements in Form S-4s filed with the SEC on May 4, 2021, June 25, 2021, July 16, 2021, August 6, 2021, and in the August 10, 2021 Proxy:

**[FS8]** Immediately prior to the Effective Time, Greenidge will deposit or cause to be deposited with Computershare evidence of class A common stock issuable pursuant to the Merger Agreement and cash sufficient to pay the fractional share consideration (as described below) (the "Exchange Fund"), for the sole benefit of the holders of shares of Support capital stock, in accordance with the Merger Agreement.

 **[FS9]** Upon surrender (i) to Computershare of a certificate together with a properly completed and validly executed letter of transmittal, or (ii) receipt by Computershare of an "agent's message" in the case of book-entry shares, and, in each case, such other documents as may be reasonably required pursuant to such instructions, the holder of such certificate or book-entry shares of Support common stock will be entitled to receive their portion of the class A common stock constituting the Merger Consideration (including any fractional share consideration) in exchange therefor (without deduction or withholding for any tax).

**[FS10]** No fractional shares of class A common stock will be issued to any holder of Support common stock.  Instead, Greenidge will pay to each holder of Support common stock who would have otherwise received a fractional share of class A common stock, an amount of cash (rounded to the nearest whole cent), without interest, equal to the number of such fractional shares for which such holder of Support common stock would be entitled to receive multiplied by the quotient of (x) the VWAP divided by (y) the Exchange Ratio.

45

149.    On September 13, 2021, Defendants Greenidge and Kirt made the following statement in the Greenidge September 13, 2021 Form 8-K and the September 13, 2021 Press Release, which was attached as an exhibit to the Greenidge September 13, 2021 Form 8-K:

> [FS11] Upon the terms and subject to the conditions described in the Merger Agreement, Merger Sub will be merged with and into Support.com (the "Merger"), with Support.com surviving the Merger as a wholly owned subsidiary of the Company.  Pursuant to the Merger Agreement, at the effective time of the Merger (the "Effective Time"), each share of Support.com common stock, par value $0.0001 per share, issued and outstanding immediately prior to the Effective Time will be cancelled and extinguished and automatically converted into the right to receive 0.115 shares (the "Exchange Ratio") of [Greenidge Class A Common Stock] plus cash in lieu of any fractional shares of Company Class A Common Stock.

> [FS12] Subject to the terms and conditions of the merger agreement, at the effective time of the merger, each share of Support.com, Inc. common stock issued and outstanding immediately prior to the effective time will be cancelled and extinguished and automatically converted into the right to receive 0.115 shares of Greenidge Class A common stock, plus cash in lieu of any fractional shares of Greenidge Class A common stock resulting from such calculation.

150.    By referencing that each share of Support Common Stock would convert to the right to receive Greenidge Class A Common Stock and cash in lieu of any fractional shares "pursuant to the Merger Agreement" and "subject to the terms and conditions of the merger agreement," Greenidge and Kirt directed investors and the public to the Merger Agreement and re-stated FS1-7.

151.    On September 14, 2021, Greenidge, through a filing by its then-wholly owned subsidiary Support, made the following statement in the September 14, 2021 Form 8-K:

> [FS13] On September 14, 2021, pursuant to the terms and conditions of the Merger Agreement, Merger Sub was merged with and into [Support] (the "Merger"), with [Support] surviving as a wholly owned subsidiary of Greenidge (the "Surviving Corporation").

> The foregoing description of the Merger and the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Merger Agreement, which is included as Exhibit 2.1 to the Current Report on

Form 8-K filed with the Securities and Exchange Commission (the "SEC") by [Support] on March 22, 2021 and is incorporated by reference herein.

At the effective time of the Merger (the "Effective Time"), (i) each share of common stock, par value $0.0001, of the Company (the "Company Common Stock") issued and outstanding immediately prior to the Effective Time was cancelled and extinguished and automatically converted into the right to receive 0.115 shares (the "Exchange Ratio") of Class A Common Stock, par value $0.0001, of Greenidge (the "Greenidge Class A Common Stock") …

152.    The September 14, 2021 Form 8-K attached and incorporated by reference a copy of the Merger Agreement.  By doing so, Greenidge restated FS1-7.

153.    On September 15, 2021, Defendants Greenidge and Kirt made the following statements in the September 15, 2021 Form 8-K:

[FS14] On September 14, 2021, GGH Merger Sub, Inc., a Delaware corporation ("Merger Sub") and a wholly owned subsidiary of [Greenidge], merged with and into [Support], with Support continuing as the surviving corporation (the "Merger") and a wholly owned subsidiary of the [Greenidge], pursuant to the previously announced [Merger Agreement].

At the effective time of the Merger (the "Effective Time"): (i) each share of common stock, par value $0.0001, of Support (the "Support Common Stock") issued and outstanding immediately prior to the Effective Time was cancelled and extinguished and automatically converted into the right to receive 0.115 (the "Exchange Ratio") shares of Class A Common Stock, par value $0.0001, of the Company (the "Company Class A Common Stock") …,

The foregoing description of the effects of the Merger and the Merger Agreement, and the transactions contemplated thereby, does not purport to be complete and is subject to, and qualified in its entirety by reference to, the full text of the Merger Agreement.  A copy of the Merger Agreement was included as Annex A to the proxy statement/prospectus forming part of the Company's Registration Statement on Form S-4 filed with the Securities and Exchange Commission (the "SEC") on May 4, 2021, and is incorporated by reference into this Item 2.01.

154.    The September 15, 2021 Form 8-K attached and incorporated by reference the Proxy.  By doing so, Defendants Greenidge and Kirt re-stated FS1-10.

155.    As alleged above at paragraphs 31 through 82, FS1-10 communicated to investors and the public, and reasonable investors and the public would conclude, that the beneficial owners

of Support Capital Stock were (a) the "holder[s] of…Book-Entry Shares" who had the right "to receive the Per Share Merger Consideration;" (b) the "[holders of Support Capital Stock] who would otherwise be entitled to receive a fraction of a share of Company [Greenidge] Class A Common Stock," (c) the "holder[s] of…book-entry shares of Support common stock [] entitled to receive their portion of the [Greenidge] class A common stock constituting the Merger Consideration (including any fractional share consideration);" and (d) the "holder[s] of Support common stock [who] would have otherwise received a fractional share of Greenidge Class A Common stock;" and as such, Greenidge would pay and/or cause the Exchange Agent to pay the beneficial owners of Support Capital Stock the Fractional Share Consideration for their fractional shares of Greenidge Class A Common Stock at the price set forth in the Merger Agreement.

156.    Defendants did not limit the payment of the Merger Consideration or Fractional Share Consideration to DTC or Shares held by DTC in the Merger Agreement, Proxy, or any of their public statements concerning the Merger.

157.    Defendants did not limit the terms "holder of Support Capital Stock," "share of Support common stock," "holder of Support common stock," or the other relevant terms, to DTC or the shares held by DTC in the Merger Agreement, Proxy, or any of their public statements concerning the Merger.

158.    While DTC is a holder of immovable fungible bulk certificates of Support Capital Stock, DTC is a clearing agency, and is not the holder of Book-Entry Shares of Support Capital Stock and is not a holder of Support Capital Stock, as those terms are used in the Merger Agreement or Proxy.

159.   Defendants did not disclose in the Merger Agreement, Proxy, or their other public statements that DTC would be treated as a single holder of Support Capital Stock for purposes of paying the Fractional Share Consideration.

160.   Therefore, Defendants communicated to the public, and reasonable investors would read FS1-10 and FS11-14 (which restated FS1-10) and conclude, that Greenidge would:

a.     Pay the Fractional Share Consideration to each beneficial owner Support Capital Stock who was otherwise entitled to receive a fractional of a share of Greenidge Class A Common Stock;

b.     Deposit or cause to be deposited cash sufficient to pay the aggregate Fractional Share Consideration for the sole benefit of beneficial owners of Support Capital Stock who were otherwise entitled to receive a fractional share of Greenidge Class A Common Stock.

c.     Deposit or cause to be deposited cash sufficient to pay the aggregate Fractional Share Consideration to the beneficial owners of Support Capital Stock who were otherwise entitled to receive a fractional share of Greenidge Class A Common Stock.

d.     Deposit or cause to be deposited additional cash into the Exchange Fund if (and when) the Exchange Fund was insufficient to pay the aggregate Fractional Share Consideration to the beneficial owners of Support Capital Stock who were otherwise entitled to receive a fractional share of Greenidge Class A Common Stock.

e.     Make the Exchange Agent pay the Fractional Share Consideration to the beneficial owners of Support Capital Stock who were otherwise entitled to receive a fractional share of Greenidge Class A Common Stock.

f.      Not allow the Exchange Fund to be used in a manner inconsistent with the terms of the Merger Agreement.

g.      Allow transferees of unregistered transactions in Support Common Stock who were otherwise entitled to receive a fractional share of Greenidge Class A Common Stock to be paid the Fractional Share Consideration.

h.      Cancel, extinguish, and automatically convert each share of Support Common Stock into the right to receive 0.115 shares of Greenidge Class A Common Stock plus cash in lieu of fractional shares.

161.    FS1-14 were untrue statements of a material fact or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5 because, no later than September 13, 2021 (when the Merger and Exchange Ratio were announced and the Fractional Share Consideration could be calculated), Defendants decided not to pay beneficial owners the Fractional Share Consideration as required by the Merger Agreement and communicated to the public, and instead decided to treat DTC as a single holder of Support Capital Stock, aggregate all fractional shares held by beneficial owners of Support Capital Stock through DTC at the DTC level, and pay DTC for those aggregated fractional shares in whole shares of Greenidge Class A Common Stock and cash for the remaining fractional share of Greenidge Class A Common Stock.

162.    The terms of the payment of the Merger Consideration and Fractional Share Consideration to beneficial owners of Support Capital Stock were material.  Defendants, when speaking concerning the payment of the Merger Consideration and Fractional Share Consideration in FS11-14, which restated FS1-10, had an obligation to speak fully and truthfully and disclose material facts necessary to make FS1-14 not misleading, including that DTC would be treated as

a single holder of Support Capital Stock, and all fractional shares of Greenidge Class A Common Stock to be received by beneficial owners of Support Capital Stock would be aggregated at the DTC level, and Greenidge would pay for those aggregated shares with whole shares of Greenidge Class A Common Stock and cash for single fractional shares.

163.    Defendants, however, never informed the public and investors that DTC would be treated as a single holder, and instead disseminated FS1-14 to the market, leading investors and the public to conclude that beneficial owners of Support Capital Stock would be, or were (for those statements that took place after the Merger closed), paid the Fractional Share Consideration for their fractional shares of Greenidge Class A Common Stock.

164.    Defendants had an obligation to disclose that beneficial owners of Support Common Stock otherwise entitled to receive fractional shares of Greenidge Class A Common Stock would not be paid the Fractional Share Consideration, and instead Greenidge would treat DTC as a single holder of Support Capital Stock, aggregate all fractional shares held by beneficial owners of Support Capital Stock through DTC at the DTC level, and pay DTC for those aggregated fractional shares in whole shares of Greenidge Class A Common Stock and cash for the remaining fractional share of Greenidge Class A Common Stock.  The failure to disclose this information rendered FS1-14 materially false, and was also an omission of material information necessary to make FS1-14 not misleading.

165.    However, in numerous Registration Statements and Prospectuses filed starting September 21, 2021, shortly after the Merger closed, Greenidge and Kirt did inform investors that DTC was the holder of the Greenidge Senior Notes, and payments to holders of the senior notes referred to payments to DTC.

166.    For example, in Greenidge's September 21, 2021 Form S-1 Registration Statement for $100,000,000 Senior Notes due 2026, which was signed by Kirt,[37] Defendants stated:

> The Notes will be issued in the form of one or more global certificates, or "Global Notes," registered in the name of The Depository Trust Company, or "DTC." DTC has informed us that its nominee will be Cede & Co.
>
> Accordingly, we expect Cede & Co. to be the initial registered holder of the Notes. No person that acquires a beneficial interest in the Notes will be entitled to receive a certificate representing that person's interest in the Notes except as described herein.   Unless and until definitive securities are issued under the limited circumstances described below, ***all references to actions by holders of the Notes will refer to actions taken by DTC upon instructions from its participants, and all references to payments and notices to holders will refer to payments and notices to DTC or Cede & Co., as the registered holder of these securities.***
>
> DTC has informed us that it is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.   DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants, or "Direct Participants," deposit with DTC.   DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts.   This eliminates the need for physical movement of securities certificates.   Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations.   DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation, or "DTCC."
>
> DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies.   DTCC is owned by the users of its regulated subsidiaries.   Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants" and, together with Direct Participants, "Participants").   DTC has an S&P rating of AA+ and a Moody's rating of Aaa.   The DTC Rules applicable to its participants are on file with the SEC.   More information about DTC can be found at www.dtcc.com.

---

[37] https://www.sec.gov/Archives/edgar/data/0001844971/000119312521277581/d205357ds1.htm.

*Purchases of the Notes under the DTC system must be made by or through Direct Participants, which will receive a credit for the Notes on DTC's records. The ownership interest of each actual purchaser of each Note, or the "Beneficial Owner," is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Notes, except in the event that use of the book-entry system for the Notes is discontinued.*

To facilitate subsequent transfers, all Notes deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Notes; DTC's records reflect only the identity of the Direct Participants to whose accounts the Notes are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to DTC. If less than all of the Notes are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the Notes to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Notes unless authorized by a Direct Participant in accordance with DTC's applicable procedures. Under its usual procedures, DTC mails an Omnibus Proxy to us as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions and interest payments on the Notes will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from us or the

53

applicable trustee or depositary on the payment date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with the Notes held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC nor its nominee, the applicable trustee or depositary, or us, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions and interest payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of us or the applicable trustee or depositary. Disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct Participants and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that we believe to be reliable, but we take no responsibility for the accuracy thereof.

None of the Company, the trustee, any depositary, or any agent of any of them will have any responsibility or liability for any aspect of DTC's or any participant's records relating to, or for payments made on account of, beneficial interests in a Global Note, or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(emphasis added).

167.    Defendants made similar and/or identical statements in the (a) October 5, 2021 Form S-1/A Registration Statement for $40,000,000 Senior Notes due 2026, which was signed by Kirt;[38] (b) October 12, 2021 Form 424B4 Prospectus for $50,000,000 8.50% Senior Notes due 2026;[39] (c) November 18, 2021 Form S-1 Registration Statement for 8.50% Senior Notes due 2026, which was signed by Kirt;[40] (d) December 1, 2021 Form S-1/A Registration Statement for

---

[38] https://www.sec.gov/Archives/edgar/data/0001844971/000119312521291578/d205357ds1a.htm.

[39] https://www.sec.gov/Archives/edgar/data/0001844971/000119312521297006/d205357d424b4.htm.

[40] https://www.sec.gov/Archives/edgar/data/0001844971/000119312521332868/d253482ds1.htm.

$35,000,000 of 8.50% Senior Notes due 2026, which was signed by Kirt;[41] and (e) December 3, 2021 Form 424B4 Prospectus for $17,000,000 of 8.50% Senior Notes due 2026.[42]

168.    The Defendants did not make any similar statements that payments to holders meant payments to DTC in the Merger Agreement, Proxy, or other public statements concerning the Merger or the payment of the Per Share Merger Consideration or the Fractional Share Consideration.

169.    While the Senior Notes are different securities than the Support Common Stock and Support Capital Stock referenced in the Merger Agreement and Proxy, Greenidge and Kirt's inclusion of the above statements in the Prospectuses and Registration statements for the Greenidge Senior Notes evidences that Greenidge and Kirt knew that it was important to inform investors when payments for securities would be made to DTC, and not to beneficial owners.

170.    Also, the statement by Greenidge and Kirt in the Prospectuses and Registration Statements for the Greenidge Senior Notes that "all references to payments and notices to holders will refer to payments and notices to DTC or Cede & Co., as the registered holder of these securities," and the failure to include any similar statement in the Merger Agreement, Proxy, or other public statements concerning the Merger, evidences that FS1-14 were, at a minimum, recklessly misleading in failing to specify that payments of Fractional Share Consideration to holders of Support Capital Stock as a result of the Merger would be made to DTC and/or Cede & Co., and not to the beneficial holders of Support Capital Stock.

171.    There is a strong presumption that (a) it takes more than seven days to prepare a Registration Statement, (b) given that the first Registration Statement for Greenidge Senior Notes

---

[41] https://www.sec.gov/Archives/edgar/data/0001844971/000119312521344458/d253482ds1a.htm.

[42] https://www.sec.gov/Archives/edgar/data/0001844971/000119312521348018/d253482d424b4.htm.

was filed on September 21, 2021, seven days after the Merger closed, Defendants were working on that Registration Statement on September 13, 2021 through September 15, 2021, when Defendants stated FS11-14 and restated FS1-10, and therefore, (c) defendants knew that FS1-14 did not inform investors that DTC would be treated as a single holder, that FS1-14 were materially false and misleading, and Defendants needed to update investors to inform them that DTC would be treated as a single holder.

172.     Defendants knew, or should have known, that investors concluded based on Defendants' statements that beneficial owners of Support Capital Stock would be paid the Fractional Share Consideration.

173.     The massive increase in price and daily trading volume of Support Common Stock in the days leading up to the Merger, as compared to the historical averages, should have led the Defendants to conclude that beneficial owners were purchasing Support Common Stock in anticipation of receiving the Per Share Merger Consideration and cash in lieu of fractional shares of Greenidge Class A Common Stock at the amount set forth in the Merger Agreement.  After all, investors would not purchase Support Common Stock as such increased prices if they believed that they would receive Fractional Share Consideration at only 10% of the amount set forth in the Merger Agreement and Proxy.

174.     At the time FS11-14 were made, and FS1-10 were restated, Defendants knew (a) when the Merger would close (September 14, 2021), (b) the Exercise Calculation Date (two business days before the closing, or September 10, 2021), (c) the Exchange Ratio (0.115), and (d) the Support Closing Price (calculated based on the trading price of Support Common Stock for the ten-trading day period before and including the Exercise Calculation Date).

175.     Therefore, at the time FS11-14 were made, and FS1-10 were restated, Defendants knew that the Merger Agreement and Proxy called for a payment of Fractional Share Consideration in the amount of $281.80 per whole share of Greenidge Class A Common Stock, and that paying the Fractional Share Consideration to all beneficial owners of Support Common Stock would be significantly more expensive than the amount indicated by the illustrative Exchange Ratios and VWAPs included in the Proxy and by the trading prices of Support Common Stock when the Proxy was filed or the Merger was announced.

176.     Further, at the time FS11-14 were made, and FS1-10 were restated, it is likely, if not certain, that the Defendants knew that they would not pay the Fractional Share Consideration to beneficial owners of Support Capital Stock who were otherwise entitled to receive fractional shares of Greenidge Class A Common Stock, and would instead treat DTC as a single holder of Support Capital Stock, aggregate all fractional shares held by beneficial owners of Support Capital Stock through DTC at the DTC level, and pay DTC for those aggregated fractional shares in whole shares of Greenidge Class A Common Stock and cash for the remaining fractional share of Greenidge Class A Common Stock.

177.     It would not be possible for Defendants to announce on September 13, 2021 that the Merger would close on September 14, 2021, and not have known how much cash would be needed to pay the Fractional Share Consideration, and therefore know that beneficial owners would not be paid the Fractional Share Consideration.

178.     On September 13, 2021, the day the Exchange Ratio and closing of the Merger were announced, Defendants knew that the price of Greenidge Class A Common Stock was at least $99.28 per share less expensive than the $281.80 Fractional Share Consideration called for in the Merger Agreement and Proxy.

179.    On September 16, 2021, at the time DTC requested additional cash to pay cash in lieu of fractional shares of Greenidge Class A Common Stock, Defendants knew that the price of Greenidge Class A Common Stock was at least $231.55 per share less expensive than the $281.80 Fractional Share Consideration called for in the Merger Agreement and Proxy.

180.    As of September 13, 2021, Defendants knew that there were likely a significant number of beneficial owners of Support Common Stock entitled to receive Fractional Share Consideration.  Defendants knew that the trading volume and price of Support Common Stock had significantly increased, and it was public knowledge that Support Common Stock had become a "meme stock" with retail investors "piling into" Support Common Stock.

181.    Therefore, at the time FS11-14 were made, and FS1-10 were restated, Defendants knew how many millions of dollars Greenidge would save by not paying the Fractional Share Consideration to beneficial owners of Support Capital Stock, and instead treating DTC as a single holder of Support Capital Stock.

182.    This is a significant financial motive to treat DTC as a single holder, rather than pay the Fractional Share Consideration to the beneficial owners of Support Capital Stock.

183.    Defendants also had an obligation to disclose that they had calculated the Support Closing Price in a manner inconsistent with the Merger Agreement and Proxy, and as such, the output of the Fractional Share Consideration formula would be different than what was set forth in the Merger Agreement and Proxy.  The failure to disclose this information rendered FS1-14 materially false, and was also an omission of material information necessary to make FS1-14 not misleading.

184.    Defendants also had an obligation to disclose that by treating DTC as a single holder for purposes of paying the Fractional Share Consideration, and aggregating all fractional

shares at the DTC level, that investors would receive approximately 10% of the Fractional Share Consideration set forth in the Merger Agreement. The failure to disclose this information rendered FS1-14 materially false, and was also an omission of material information necessary to make FS1-14 not misleading.

185.    Defendants decision to pay the Fractional Share Consideration in a manner inconsistent with the terms of the Merger Agreement and Proxy by (a) not paying the Fractional Share Consideration to the beneficial owners of Support Capital Stock otherwise entitled to receive a fractional share of Greenidge Class A Common Stock; (b) treating DTC as a single holder of Support Capital Stock, aggregating all fractional shares of Greenidge Class A Common Stock at the DTC level, and paying DTC for those fractional shares in whole shares of Greenidge Class A Common Stock and cash for a single fractional share; and (c) calculating the Support Closing Price by including Labor Day as a trading day, reducing the Support Closing Price, constituted a scheme to defraud in violation of Section 10(b) and Rule 10b-5 for the reasons set forth in paragraphs 100 through 184.

## L.    Additional Scienter Allegations

186.    There is a strong inference that FS1-14 were knowingly or recklessly materially false and misleading and made with the requisite scienter.

187.    DTC, realizing that Greenidge had not deposited and paid cash to properly compensate holders of Support Capital Stock for their fractional shares Greenidge Class A Common Stock at the Fractional Share Consideration, asked Greenidge to deposit and pay more cash for the payment of Fractional Share Consideration. Greenidge refused.

188.    The fact that DTC did not conclude that Greenidge's actions were the proper payment of Fractional Share Consideration supports a strong inference that FS1-14 were knowingly or recklessly false and misleading, or Defendants omitted material information

concerning the payment of Fractional Share Consideration necessary to make FS1-14 not misleading.

189.    Also, it takes time to prepare for the mechanisms of paying cash in lieu of fractional shares.  Defendants therefore would have needed ample time to gather the millions of dollars necessary to pay the Fractional Share Consideration to beneficial holders, as opposed to the maximum $281.80 needed to pay for a single fractional share at the DTC level.

190.    Therefore, at the time Defendants made FS11-14, and re-stated FS1-10, they would have known that they were not going to pay millions of dollars to beneficial owners for those owners' fractional shares of Greenidge Class A Common Stock, and would instead pay DTC for those fractional shares in whole shares of Greenidge Class A Common Stock and a maximum of $281.80 in cash.

191.    Further, at the time FS11-14 were made, and FS1-10 were restated, Defendants must have known exactly how much cash and stock they would be depositing with the Exchange Agent for the benefit of holders of Support Capital Stock.  As such, there is a strong inference that at the time FS11-14 were made, Defendants knew that they would not be paying the Fractional Share Consideration to all beneficial owners of Support Common Stock, and instead would treat DTC as a single holder, aggregate all fractional shares at the DTC level, and pay DTC in whole shares of Greenidge Class A Common Stock and cash for a single fractional share in an amount less than $281.80.

192.    For the same reason, there is a strong inference that as of September 13, 2021, Defendants had begun to calculate or finished the calculation for the Fractional Share Consideration, and knew that they would calculate the Fractional Share Consideration in a manner different than the manner set forth in the Merger Agreement and Proxy.

193.    As alleged in paragraphs 165 through 171, in numerous Registration Statements and Prospectuses for Greenidge Senior Notes, Greenidge and Kirt did inform investors that payments to holders of the Senior Notes referred to payments to DTC.

194.    The fact that Greenidge and Kirt made these statements, one of which was made on September 21, 2021, approximately one week after the Merger Closed, evidences that Greenidge and Kirt knew that it was necessary to inform investors and the public prior to make investment decisions (such as voting in favor of, or against, the Merger) that cash payments to holders of securities meant payments to DTC, and not payments to beneficial owners.

195.    It is extremely likely that Greenidge and Kirt were preparing the September 21, 2021 Registration Statement for Greenidge Senior Notes more than seven days before it was filed, and therefore likely that they were preparing this Registration Statement on September 13, 2021, when FS1-14 were made or restated.  This evidences that Greenidge and Kirt knew that FS1-14 were materially false and misleading by failing to disclose that Fractional Share Consideration would be paid to DTC as a single holder.

196.    Kirt, as the CEO and Chairman of Greenidge, signed the Merger Agreement on behalf of Greenidge.

197.    Kirt also signed the Greenidge Form 8-Ks alleged herein to contain materially false and misleading statements.

198.    Kirt, as the CEO and Chairman of Greenidge, directed the filing of the Proxy.  Kirt also signed portions of the Proxy, as alleged herein.

199.    Kirt, as the CEO and Chairman of Greenidge, made or oversaw the ultimate decision on how to pay the Fractional Share Consideration after closing of the Merger, including treating DTC as a single holder, aggregating fractional shares of Greenidge Class A Common

Stock at the DTC level, and paying DTC for those fractional shares in whole share of Greenidge Class A Common Stock and cash for a single fractional share of Greenidge Class A Common Stock in an amount less than called for by the express formula in the Merger Agreement and Proxy.

200.    DTC requested the Greenidge provide more money to pay holders of Support Common Stock the Fractional Share Consideration.  Greenidge considered DTC's request but refused to provide any additional funds.  Kirt, as the CEO and Chairman of Greenidge, made or oversaw the ultimate decision not to provide those additional funds to DTC to pay the Fractional Share Consideration.

201.    Kirt's scienter is imputable to Greenidge based on *respondeat superior*.

202.    Rosenzweig, as the CEO of Support prior to the Merger, signed the Merger Agreement on behalf of Support.

203.    Rosenzweig, the CEO and Chairman of Support, directed the filing of the Proxy for Support.  Rosenzweig also signed portions of the Proxy.

204.    Rosenzweig was the CEO and President of Support after the Merger, and is listed as a member of senior management of Greenidge on Greenidge's investor relations website.[43]

205.    Rosenzweig, as the CEO of Support once it became a subsidiary of Greenidge, singed and directed the filing of the September 14, 2021 8-K.

206.    Rosenzweig's scienter is imputable to Greenidge based on *respondeat superior*.

207.    Rosenzweig, as the CEO of Support who signed the Merger Agreement and Proxy, knew how the Fractional Share Consideration was supposed to be paid under the Merger Agreement and Proxy.

---

[43] https://ir.greenidge.com/corporate-governance/management.

208.     Rosenzweig, as the CEO of Support, had fiduciary duties of care and loyalty to holders of Support Common Stock, and had an obligation to ensure Support Stockholders received the highest possible price for their shares of Support Common Stock in the Merger.

209.     Rosenzweig would not have, and should not have, entered into a Merger Agreement or issued a Proxy that would result in beneficial owners of Support Common Stock receiving 10% of the Fractional Share Consideration called for by the express terms of the Merger Agreement and Proxy.

**M.     Plaintiffs' Purchases of Support Securities, Damages, and Reliance**

210.     Prior to purchasing Support Common Stock, Support Common Stock call options, and GREE1 call options, and selling Support Common Stock put options and GREE1 put options, Plaintiffs expected that the cash in lieu portion of their options would be determined by the Fractional Share Consideration called for by the Merger Agreement and Proxy and to be paid to holders of Support Capital Stock who were entitled to receive fractional shares of Greenidge Class A Common Stock - the beneficial owners of Support Capital Stock.

211.     Had Plaintiffs been aware of Defendants' scheme and that FS1-14 were materially false and misleading and/or omitted material information, that Defendants would not pay the Fractional Share Consideration to the beneficial owners of Support Capital Stock in the amount set forth in the Merger Agreement and Proxy, and that Defendants would treat DTC as a single holder for the payment of Fractional Share Consideration, aggregate all fractional shares at the DTC level, and pay DTC in whole Greenidge Class A Common Stock shares and cash for a single fractional shares of Greenidge Class A Common Stock, they would not have purchased Support Common Stock, Support Common Stock call options, and GREE1 call options, and sold Support Common Stock put options and GREE1 put options.

212.     Had Defendants disclosed that DTC would be treated as a single holder, that Fractional Share Consideration would be calculated in a way different than the formula set forth in the Merger Agreement and Proxy, and that beneficial owners would not be paid the Fractional Share Consideration for each Fractional Share, as set forth in FS1-14, then Plaintiffs would have known that the cash in lieu of fractional shares of Greenidge Class A Common Stock, and cash in lieu of 0.5 fractional shares of Greenidge Class A Common Stock portion of their GREE1 options, would have been substantially less than the Fractional Share Consideration formula set forth in the Merger Agreement and Proxy.

        1.     **Funicular's Purchases of Support Common Stock, Support Common Stock Call Options, and GREE1 Call Options; Sale of Support Common Stock Put Options and GREE1 Put Options; and Damages**

213.     On September 13, 2021, Funicular purchased 1,000 exchange traded Support Common Stock $30 call options with expiration dates of September 17, 2021 and sold 1,000 exchange traded Support Common Stock $30 put options with expiration dates of September 17, 2021.

214.     Prior to Funicular's September 13, 2021 transactions in Support Common Stock put and call options, Funicular had read the Merger Agreement, Proxy, September 13, 2021 Press Release, and Greenidge September 13, 2021 Form 8-K and FS1-12 therein.  Funicular relied on FS1-12 when making these purchases and sales of Support Common Stock put and call options.

215.     On September 14, 2021, Funicular purchased 32 shares of Support Common Stock. Funicular purchased these shares in four different accounts, purchasing 8 shares in each account.

216.     Prior to Funicular's September 14, 2021 purchases of Support Common Stock, Funicular had read the Merger Agreement, Proxy, September 13, 2021 Press Release, and Greenidge September 13, 2021 Form 8-K and FS1-12 therein.  Funicular relied on FS1-12 when making these purchases of Support Common Stock.

217.    Based upon the statements made by Defendants in the Proxy, Merger Agreement, and their press releases and Form 8-Ks, Funicular should have received no whole shares of Greenidge Class A Common Stock and $259.26 (8 shares x 0.115 Exchange Ratio x $281.80 Fractional Share Consideration) in Fractional Share Consideration per account; or, in the alternative, had Funicular's holdings been aggregated, Funicular should have received 3 whole shares of Greenidge Class A Common Stock and cash in lieu of 0.68 fractional shares in the amount of $191.22.

218.    On or before September 28, 2021, Funicular received a total of $194.47 as payment of Fractional Share Consideration for its 32 shares of Support Common Stock, in payments in four accounts of $108.60, $43.65, $39.93, and $2.29, respectively.  Funicular did not receive any whole shares of Greenidge Class A Common Stock in exchange for the 32 shares.

219.    The large discrepancy in payment amounts received in each account reflects differences in each brokers' internal policies for allocating the receipt of insufficient amounts of Fractional Share Consideration, and it is illustrative of the consequences of Defendants' decision to treat DTC as a single holder.

220.    On September 15, 2021, Funicular's 1,000 Support Common Stock September 17, 2021 $30 call options and 1,000 Support Common Stock September 17, 2021 $30 put options were adjusted to GREE1 options.

221.    On September 15, 2021, Funicular purchased 2,000 exchange traded GREE1 $0.5 call options with expiration dates of September 17, 2021 and 1,000 exchange traded GREE1 $1 call options with expiration dates of September 17, 2021, and sold 5,427 exchange traded GREE1 $30 put options with expiration dates of September 17, 2021.

222.     On September 16, 2021, Funicular purchased 4,500 exchange traded GREE1 $1 call options with expiration dates of September 17, 2021.

223.     Prior to Funicular's September 15 and 16, 2021 transactions in GREE1 put and call options, Funicular had read the Merger Agreement, Proxy, September 13, 2021 Press Release, Greenidge September 13, 2021 Form 8-K, September 14, 2021 Form 8-K, and September 15, 2021 Form 8-K and FS1-14 therein.  Funicular relied on FS1-14 when making these purchases and sales of GREE1 put and call options.

224.     By September 17, 2021, Funicular's outstanding GREE1 put options were assigned and the in-the-money call options were exercised, for a total of 13,927 options exercised or assigned.  Funicular did not exercise its 1,000 exchange traded Support Common Stock $30 call options (adjusted to GREE1 options on September 15, 2021), which expired on September 17, 2021.

225.     Upon exercise or assignment of Funicular's 13,927 option contracts, Funicular received the right to receive Fractional Share Consideration for 0.5 fractional shares of Greenidge Class A Common Stock per contract at the price of $281.80 per whole share of Greenidge Class A Common Stock, or $140.90 per 0.5 fractional shares of Greenidge Class A Common Stock, which totaled $1,962,314.30 (13,927 x 0.5 x $281.80).

226.     On or about September 24, 2021, the OCC used the Fractional Share Consideration ultimately paid to beneficial owners of Support Common Stock to settle Funicular's options with a cash in lieu of fractional shares value of $28.64 per whole share of Greenidge Class A Common Stock, or $14.32 per 0.5 fractional shares of Greenidge Class A Common Stock due per GREE1 option contract.

227.    Funicular received a total of $199,434.64 for the cash in lieu portion of its exercised options, approximately 10% of what it was entitled to receive based upon the Fractional Share Consideration formula set forth in the Merger Agreement and Proxy.

228.    Therefore, as a result of Defendants materially false and misleading statements and fraudulent scheme, Funicular suffered damages of $1,762,880 related to the cash in lieu for 0.5 fractional shares of Greenidge Class A Common Stock portion of its GREE1 options contracts, and damages of $842.57 related to its 32 shares of Support Common Stock.

**2.    Anson's Purchases of GREE1 Call Options and Damages**

229.    On September 16, 2021, AIMF purchased 864 exchange traded GREE1 $1 call options with expiration dates of September 17, 2021, and 13,275 exchange traded GREE1 $0.50 call options with expiration dates of September 17, 2021.   AIMF exercised these options on September 16, 2021.

230.    Prior to purchasing these GREE1 call options, AIMF had read the Merger Agreement, Proxy, September 13, 2021 Press Release, Greenidge September 13, 2021 Form 8-K, September 14, 2021 Form 8-K, and September 15, 2021 Form 8-K and FS1-14 therein.   AIMF relied on FS1-14 when making these purchases of GREE1 call options.

231.    Upon exercise of these 14,139 options, AIMF received the right to receive Fractional Share Consideration for 0.5 fractional shares of Greenidge Class A Common Stock per contract at the price of $281.80 per whole share of Greenidge Class A Common Stock, or $140.90 per 0.5 fractional shares of Greenidge Class A Common Stock, which totaled $1,992,185.10 (14,139 x 0.5 x $281.80).

232.    On or about September 24, 2021, the OCC used the Fractional Share Consideration ultimately paid to beneficial owners of Support Common Stock to settle AIMF's options with a cash in lieu of fractional shares value of $28.64 per whole share of Greenidge Class A Common

Stock, or $14.32 per 0.5 fractional shares of Greenidge Class A Common Stock due per GREE1 option contract.

233.    AIMF received a total of $202,470.48 for the cash in lieu portion of its exercised options, approximately 10% of what it was entitled to receive based upon the Fractional Share Consideration formula set forth in the Merger Agreement and Proxy.

234.    On September 16, 2021, AEMF purchased 287 exchange traded GREE1 $1 call options with expiration dates of September 17, 2021, and 4,425 exchange traded GREE1 $0.50 call options with expiration dates of September 17, 2021.   AEMF exercised these options on September 16, 2021.

235.    Prior to purchasing these GREE1 call options, AEMF had read the Merger Agreement, Proxy, September 13, 2021 Press Release, Greenidge September 13, 2021 Form 8-K, September 14, 2021 Form 8-K, and September 15, 2021 Form 8-K and FS1-14 therein.   AEMF relied on FS1-14 when making these purchases of GREE1 call options.

236.    Upon exercise of these 4,712 options, AEMF received the right to receive Fractional Share Consideration for 0.5 fractional shares of Greenidge Class A Common Stock per contract at the price of $281.80 per whole share of Greenidge Class A Common Stock, or $140.90 per 0.5 fractional shares of Greenidge Class A Common Stock, which totaled $663,920.80 (4,712 x 0.5 x $281.80).

237.    On or about September 24, 2021, the OCC used the Fractional Share Consideration ultimately paid to beneficial owners of Support Common Stock to settle AEMF's options with a cash in lieu of fractional shares value of $28.64 per whole share of Greenidge Class A Common Stock, or $14.32 per 0.5 fractional shares of Greenidge Class A Common Stock due per GREE1 option contract.

238.    AEMF received a total of $67,475.84 for the cash in lieu portion of its exercised options, approximately 10% of what it was entitled to receive based upon the Fractional Share Consideration formula set forth in the Merger Agreement and Proxy.

239.    Therefore, as a result of Defendants materially false and misleading statements and omissions and fraudulent scheme, Anson suffered damages of $2,386,160 related to 0.5 fractional shares of Greenidge Class A Common Stock portion of its GREE1 options contracts.

**N.    Loss Causation**

240.    Funicular, AIMF, and AEMF's damages are the direct result of Defendants scheme to defraud and materially false and misleading statements and omissions.

241.    Because of Defendants' miscalculation of the Support Closing Price (VWAP) and Fractional Share Consideration, treatment of DTC as a single holder, aggregation of all Greenidge Class A Common Stock fractional shares at DTC, and payment to DTC of whole Greenidge Class A Common Stock shares and a single Greenidge Class A Common Stock fractional share, cash in lieu of fractional shares of Greenidge Class A Common Stock was paid at $28.64 per share, as published by DTC.

242.    OCC used the $28.64 per share amount published by DTC when calculating the cash in lieu portion of the GREE1 put and call options, setting the cash in lieu portion of GREE1 options at $14.32 per 0.5 fractional share of Greenidge Class A Common Stock ($28.64 x 0.5) instead of the $281.80 per share of Greenidge Class A Common Stock Fractional Share Consideration set forth in the Merger Agreement and Proxy.

243.    Had Defendants paid the Fractional Share Consideration to all beneficial holders of Support Capital Stock at the price set forth in the Merger Agreement and Proxy of $281.80 per share of Greenidge Class A Common Stock, as Defendants' public statements communicated they would, then the cash in lieu portion of Plaintiffs' exercised GREE1 call and put options would

have been $140.90 per 0.5 fractional share of Greenidge Class A Common Stock, significantly greater than the $14.32 per 0.5 fractional share of Greenidge Class A Common Stock actually paid.

244.     Defendants knew, or were reckless in not knowing, that FS1-14 and their fraudulent scheme would impact the cash in lieu of 0.5 fractional shares of Greenidge Class A Common Stock portion of the GREE1 options.

## V.     CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Sec Rule 10b-5
### Against All Defendants

245.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

246.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

247.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

248.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    a.     employed devices, schemes and artifices to defraud;

    b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with Plaintiffs' purchases of Support Common

Stock and exchange traded Support Common Stock call options and GREE1 call options, and sale of exchange traded Support Common Stock put options and GREE1 put options.

249.     Defendants acted with scienter in that they knew that the public documents and statements made by them, authorized by them, or issued or disseminated in the name of Greenidge were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

250.     Defendants, by virtue of their knowledge of the true facts concerning the treatment of DTC as a single holder and payment of the Fractional Share Consideration, their control over, and/or receipt and/or modification of Greenidge's allegedly materially misleading statements, and/or their associations with Greenidge, which made them privy to confidential proprietary information concerning the treatment of DTC as a single holder and payment of the Fractional Share Consideration, participated in the fraudulent scheme alleged herein.

251.     Kirt, who was a senior officer of Greenidge, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the investing public, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made by him or other Greenidge personnel to members of the investing public, including Plaintiffs.

252.     Had Plaintiffs been aware of Defendants' fraudulent scheme and that FS1-14 were materially false and misleading and Defendants would treat DTC as a single holder of Support Capital Stock, aggregate fractional share of Greenidge Class A Common Stock at the DTC level, pay DTC for those fractional shares in whole shares of Greenidge Class A Common Stock and for

a single fractional shares of Greenidge Class A Common Stock, driving down the cash paid for fractional shares to 10% of the Fractional Share Consideration specified in Defendants' public statements, Plaintiffs would not have purchased Support Common Stock or Support Common Stock call options or GREE1 call options, or sold Support Common Stock put options or GREE1 put options.

253.    As a result of the wrongful conduct alleged herein, Plaintiffs have suffered damages in an amount to be established at trial.

254.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs for substantial damages which they suffered in connection with their purchase of Support Common Stock, Support Common Stock call options, or GREE1 call options, or sale of Support Common Stock put options or GREE1 put options, and receipt of cash-in lieu of fractional shares of Greenidge Class A Common Stock in connection with the Merger and exercise or assignment of GREE1 put and call options.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against Defendant Kirt

255.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

256.    Defendant Greenidge violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

257.    Defendant Kirt was a controlling person of Greenidge within the meaning of Section 20(a) of the Exchange Act as alleged herein.

258.    By virtue of his high-level position, agency, ownership and contractual rights, and participation in and/or awareness of Greenidge's operations and/or intimate knowledge of Greenidge's actual performance, Kirt had the power to influence and control and did influence and control, directly or indirectly, the decision making of Greenidge, including the content and dissemination of the materially false and misleading statements alleged herein.

259.    Kirt participated in the operation and management of Greenidge, and conducted and participated, directly and indirectly, in the conduct of Greenidge's business affairs.  Because of his senior position, Kirt knew the adverse non-public information about Greenidge's misstatement and false statements.

260.    As an officer of a publicly owned company, Kirt had a duty to disseminate accurate and truthful information with respect to the Merger, and to correct promptly any public statements issued by Greenidge which had become materially false or misleading.

261.    Because of Kirt's position of control and authority as a senior officer, he was able to, and did, control the contents of the Merger Agreement, Proxy, press releases, and public filings which Greenidge disseminated in the marketplace concerning the Merger.  Kirt exercised his power and authority to cause Greenidge to enter into the Merger and engage in the wrongful acts complained of herein.

262.    Kirt, therefore, was a "controlling person" of Greenidge within the meaning of Section 20(a) of the Exchange Act.

263.    By reason of the above conduct, Kirt is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Greenidge.

## COUNT III
### In the Alternative, Common Law Fraud
### Against All Defendants

264.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

265.    The elements of a claim for common law fraud under New York Law are a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.

266.    FS1-14 were misrepresentations or materially omissions of fact which were false.

267.    FS1-14 were known to be false by the Defendants.

268.    FS1-14 were made for the purpose of inducing the investing public, including Plaintiffs, to rely upon FS1-14.

269.    Plaintiffs justifiably relied on FS1-14.  They assumed FS1-14 were true and that Defendants did not make misrepresentations or material omissions of fact, and that they could rely on Defendants' statements concerning the payment of Fractional Share Consideration.

270.    Plaintiffs were injured when the truth concerning Defendants' misrepresentations and omissions were revealed in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transgressions alleged herein;

B.    Awarding Plaintiffs pre- and post-judgment interest;

C.    Issuing a declaratory judgment that the Fractional Share Consideration was $281.80 per whole share of Greenidge Class A Common Stock;

D.      Issuing a declaratory judgment that Defendants' public statements concerning the payment of Fractional Share Consideration required Greenidge to pay all beneficial owners of Support Common Stock the Fractional Share Consideration on a beneficial holder by beneficial holder basis at the rate of $281.80 per whole shares of Greenidge Class A Common Stock; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

Dated:  December 22, 2022
        New York, New York

                                    **WOLF POPPER LLP**

                                    By: _____
                                    Carl L. Stine
                                    cstine@wolfpopper.com
                                    Robert C. Finkel
                                    rfinkel@wolfpopper.com
                                    Joshua W. Ruthizer
                                    jruthizer@wolfpopper.com
                                    845 Third Avenue, 12th Floor
                                    New York, NY 10022
                                    Telephone: (212) 759-4600

                                    *Attorneys for Plaintiffs The Funicular Fund,*
                                    *LP, Anson Investments Master Fund, LP,*
                                    *and Anson East Master Fund, LP*

| APPENDIX 1 | | | |
|---|---|---|---|
| **Shares of SPRT** | **Exchange Ratio** | **Resulting Shares of GREE** | **Fractional Shares of GREE** |
| 1 | 0.115 | 0.115 | 0.115 |
| 2 | 0.115 | 0.230 | 0.230 |
| 3 | 0.115 | 0.345 | 0.345 |
| 4 | 0.115 | 0.460 | 0.460 |
| 5 | 0.115 | 0.575 | 0.575 |
| 6 | 0.115 | 0.690 | 0.690 |
| 7 | 0.115 | 0.805 | 0.805 |
| 8 | 0.115 | 0.920 | 0.920 |
| 9 | 0.115 | 1.035 | 0.035 |
| 10 | 0.115 | 1.150 | 0.150 |
| 11 | 0.115 | 1.265 | 0.265 |
| 12 | 0.115 | 1.380 | 0.380 |
| 13 | 0.115 | 1.495 | 0.495 |
| 14 | 0.115 | 1.610 | 0.610 |
| 15 | 0.115 | 1.725 | 0.725 |
| 16 | 0.115 | 1.840 | 0.840 |
| 17 | 0.115 | 1.955 | 0.955 |
| 18 | 0.115 | 2.070 | 0.070 |
| 19 | 0.115 | 2.185 | 0.185 |
| 20 | 0.115 | 2.300 | 0.300 |
| 21 | 0.115 | 2.415 | 0.415 |
| 22 | 0.115 | 2.530 | 0.530 |
| 23 | 0.115 | 2.645 | 0.645 |
| 24 | 0.115 | 2.760 | 0.760 |
| 25 | 0.115 | 2.875 | 0.875 |
| 26 | 0.115 | 2.990 | 0.990 |
| 27 | 0.115 | 3.105 | 0.105 |
| 28 | 0.115 | 3.220 | 0.220 |
| 29 | 0.115 | 3.335 | 0.335 |
| 30 | 0.115 | 3.450 | 0.450 |
| 31 | 0.115 | 3.565 | 0.565 |
| 32 | 0.115 | 3.680 | 0.680 |
| 33 | 0.115 | 3.795 | 0.795 |
| 34 | 0.115 | 3.910 | 0.910 |
| 35 | 0.115 | 4.025 | 0.025 |
| 36 | 0.115 | 4.140 | 0.140 |
| 37 | 0.115 | 4.255 | 0.255 |

| APPENDIX 1 | | | |
|---|---|---|---|
| **Shares of SPRT** | **Exchange Ratio** | **Resulting Shares of GREE** | **Fractional Shares of GREE** |
| 38 | 0.115 | 4.370 | 0.370 |
| 39 | 0.115 | 4.485 | 0.485 |
| 40 | 0.115 | 4.600 | 0.600 |
| 41 | 0.115 | 4.715 | 0.715 |
| 42 | 0.115 | 4.830 | 0.830 |
| 43 | 0.115 | 4.945 | 0.945 |
| 44 | 0.115 | 5.060 | 0.060 |
| 45 | 0.115 | 5.175 | 0.175 |
| 46 | 0.115 | 5.290 | 0.290 |
| 47 | 0.115 | 5.405 | 0.405 |
| 48 | 0.115 | 5.520 | 0.520 |
| 49 | 0.115 | 5.635 | 0.635 |
| 50 | 0.115 | 5.750 | 0.750 |
| 51 | 0.115 | 5.865 | 0.865 |
| 52 | 0.115 | 5.980 | 0.980 |
| 53 | 0.115 | 6.095 | 0.095 |
| 54 | 0.115 | 6.210 | 0.210 |
| 55 | 0.115 | 6.325 | 0.325 |
| 56 | 0.115 | 6.440 | 0.440 |
| 57 | 0.115 | 6.555 | 0.555 |
| 58 | 0.115 | 6.670 | 0.670 |
| 59 | 0.115 | 6.785 | 0.785 |
| 60 | 0.115 | 6.900 | 0.900 |
| 61 | 0.115 | 7.015 | 0.015 |
| 62 | 0.115 | 7.130 | 0.130 |
| 63 | 0.115 | 7.245 | 0.245 |
| 64 | 0.115 | 7.360 | 0.360 |
| 65 | 0.115 | 7.475 | 0.475 |
| 66 | 0.115 | 7.590 | 0.590 |
| 67 | 0.115 | 7.705 | 0.705 |
| 68 | 0.115 | 7.820 | 0.820 |
| 69 | 0.115 | 7.935 | 0.935 |
| 70 | 0.115 | 8.050 | 0.050 |
| 71 | 0.115 | 8.165 | 0.165 |
| 72 | 0.115 | 8.280 | 0.280 |
| 73 | 0.115 | 8.395 | 0.395 |
| 74 | 0.115 | 8.510 | 0.510 |

| APPENDIX 1 | | | |
|---|---|---|---|
| Shares of SPRT | Exchange Ratio | Resulting Shares of GREE | Fractional Shares of GREE |
| 75 | 0.115 | 8.625 | 0.625 |
| 76 | 0.115 | 8.740 | 0.740 |
| 77 | 0.115 | 8.855 | 0.855 |
| 78 | 0.115 | 8.970 | 0.970 |
| 79 | 0.115 | 9.085 | 0.085 |
| 80 | 0.115 | 9.200 | 0.200 |
| 81 | 0.115 | 9.315 | 0.315 |
| 82 | 0.115 | 9.430 | 0.430 |
| 83 | 0.115 | 9.545 | 0.545 |
| 84 | 0.115 | 9.660 | 0.660 |
| 85 | 0.115 | 9.775 | 0.775 |
| 86 | 0.115 | 9.890 | 0.890 |
| 87 | 0.115 | 10.005 | 0.005 |
| 88 | 0.115 | 10.120 | 0.120 |
| 89 | 0.115 | 10.235 | 0.235 |
| 90 | 0.115 | 10.350 | 0.350 |
| 91 | 0.115 | 10.465 | 0.465 |
| 92 | 0.115 | 10.580 | 0.580 |
| 93 | 0.115 | 10.695 | 0.695 |
| 94 | 0.115 | 10.810 | 0.810 |
| 95 | 0.115 | 10.925 | 0.925 |
| 96 | 0.115 | 11.040 | 0.040 |
| 97 | 0.115 | 11.155 | 0.155 |
| 98 | 0.115 | 11.270 | 0.270 |
| 99 | 0.115 | 11.385 | 0.385 |
| 100 | 0.115 | 11.500 | 0.500 |
| 101 | 0.115 | 11.615 | 0.615 |
| 102 | 0.115 | 11.730 | 0.730 |
| 103 | 0.115 | 11.845 | 0.845 |
| 104 | 0.115 | 11.960 | 0.960 |
| 105 | 0.115 | 12.075 | 0.075 |
| 106 | 0.115 | 12.190 | 0.190 |
| 107 | 0.115 | 12.305 | 0.305 |
| 108 | 0.115 | 12.420 | 0.420 |
| 109 | 0.115 | 12.535 | 0.535 |
| 110 | 0.115 | 12.650 | 0.650 |
| 111 | 0.115 | 12.765 | 0.765 |

| APPENDIX 1 | | | |
| --- | --- | --- | --- |
| Shares of SPRT | Exchange Ratio | Resulting Shares of GREE | Fractional Shares of GREE |
| 112 | 0.115 | 12.880 | 0.880 |
| 113 | 0.115 | 12.995 | 0.995 |
| 114 | 0.115 | 13.110 | 0.110 |
| 115 | 0.115 | 13.225 | 0.225 |
| 116 | 0.115 | 13.340 | 0.340 |
| 117 | 0.115 | 13.455 | 0.455 |
| 118 | 0.115 | 13.570 | 0.570 |
| 119 | 0.115 | 13.685 | 0.685 |
| 120 | 0.115 | 13.800 | 0.800 |
| 121 | 0.115 | 13.915 | 0.915 |
| 122 | 0.115 | 14.030 | 0.030 |
| 123 | 0.115 | 14.145 | 0.145 |
| 124 | 0.115 | 14.260 | 0.260 |
| 125 | 0.115 | 14.375 | 0.375 |
| 126 | 0.115 | 14.490 | 0.490 |
| 127 | 0.115 | 14.605 | 0.605 |
| 128 | 0.115 | 14.720 | 0.720 |
| 129 | 0.115 | 14.835 | 0.835 |
| 130 | 0.115 | 14.950 | 0.950 |
| 131 | 0.115 | 15.065 | 0.065 |
| 132 | 0.115 | 15.180 | 0.180 |
| 133 | 0.115 | 15.295 | 0.295 |
| 134 | 0.115 | 15.410 | 0.410 |
| 135 | 0.115 | 15.525 | 0.525 |
| 136 | 0.115 | 15.640 | 0.640 |
| 137 | 0.115 | 15.755 | 0.755 |
| 138 | 0.115 | 15.870 | 0.870 |
| 139 | 0.115 | 15.985 | 0.985 |
| 140 | 0.115 | 16.100 | 0.100 |
| 141 | 0.115 | 16.215 | 0.215 |
| 142 | 0.115 | 16.330 | 0.330 |
| 143 | 0.115 | 16.445 | 0.445 |
| 144 | 0.115 | 16.560 | 0.560 |
| 145 | 0.115 | 16.675 | 0.675 |
| 146 | 0.115 | 16.790 | 0.790 |
| 147 | 0.115 | 16.905 | 0.905 |
| 148 | 0.115 | 17.020 | 0.020 |

| APPENDIX 1 | | | |
|---|---|---|---|
| Shares of SPRT | Exchange Ratio | Resulting Shares of GREE | Fractional Shares of GREE |
| 149 | 0.115 | 17.135 | 0.135 |
| 150 | 0.115 | 17.250 | 0.250 |
| 151 | 0.115 | 17.365 | 0.365 |
| 152 | 0.115 | 17.480 | 0.480 |
| 153 | 0.115 | 17.595 | 0.595 |
| 154 | 0.115 | 17.710 | 0.710 |
| 155 | 0.115 | 17.825 | 0.825 |
| 156 | 0.115 | 17.940 | 0.940 |
| 157 | 0.115 | 18.055 | 0.055 |
| 158 | 0.115 | 18.170 | 0.170 |
| 159 | 0.115 | 18.285 | 0.285 |
| 160 | 0.115 | 18.400 | 0.400 |
| 161 | 0.115 | 18.515 | 0.515 |
| 162 | 0.115 | 18.630 | 0.630 |
| 163 | 0.115 | 18.745 | 0.745 |
| 164 | 0.115 | 18.860 | 0.860 |
| 165 | 0.115 | 18.975 | 0.975 |
| 166 | 0.115 | 19.090 | 0.090 |
| 167 | 0.115 | 19.205 | 0.205 |
| 168 | 0.115 | 19.320 | 0.320 |
| 169 | 0.115 | 19.435 | 0.435 |
| 170 | 0.115 | 19.550 | 0.550 |
| 171 | 0.115 | 19.665 | 0.665 |
| 172 | 0.115 | 19.780 | 0.780 |
| 173 | 0.115 | 19.895 | 0.895 |
| 174 | 0.115 | 20.010 | 0.010 |
| 175 | 0.115 | 20.125 | 0.125 |
| 176 | 0.115 | 20.240 | 0.240 |
| 177 | 0.115 | 20.355 | 0.355 |
| 178 | 0.115 | 20.470 | 0.470 |
| 179 | 0.115 | 20.585 | 0.585 |
| 180 | 0.115 | 20.700 | 0.700 |
| 181 | 0.115 | 20.815 | 0.815 |
| 182 | 0.115 | 20.930 | 0.930 |
| 183 | 0.115 | 21.045 | 0.045 |
| 184 | 0.115 | 21.160 | 0.160 |
| 185 | 0.115 | 21.275 | 0.275 |

| APPENDIX 1 | | | |
|---|---|---|---|
| **Shares of SPRT** | **Exchange Ratio** | **Resulting Shares of GREE** | **Fractional Shares of GREE** |
| 186 | 0.115 | 21.390 | 0.390 |
| 187 | 0.115 | 21.505 | 0.505 |
| 188 | 0.115 | 21.620 | 0.620 |
| 189 | 0.115 | 21.735 | 0.735 |
| 190 | 0.115 | 21.850 | 0.850 |
| 191 | 0.115 | 21.965 | 0.965 |
| 192 | 0.115 | 22.080 | 0.080 |
| 193 | 0.115 | 22.195 | 0.195 |
| 194 | 0.115 | 22.310 | 0.310 |
| 195 | 0.115 | 22.425 | 0.425 |
| 196 | 0.115 | 22.540 | 0.540 |
| 197 | 0.115 | 22.655 | 0.655 |
| 198 | 0.115 | 22.770 | 0.770 |
| 199 | 0.115 | 22.885 | 0.885 |
| 200 | 0.115 | 23.000 | 0.000 |